## DAVIDSON v. LEE.

(Court of Civil Appeals of Texas. Galveston. June 10, 1911. Rehearing Denied Oct. 5, 1911.)

1. DAMAGES (§ 49*) — MENTAL SUFFERING — WILLFUL INJURY.

The rule that damages are not recoverable for mental suffering unaccompanied by physical injury is inapplicable, where the wrong complained of is a willful one, intended by the wrongdoer to produce mental anguish, or from which such result should be reasonably anticipated.

[Ed. Note.—For other cases, see Damages, Cent. Dig. § 100; Dec. Dig. § 49.*]

2. ASSAULT AND BATTERY (§ 38*)—DAMAGES—MENTAL SUFFERING—WILLFUL INJURY.

A creditor, who unlawfully restrained in his rooms the person of the debtor, and who, by the use of a deadly weapon in a threatening manner, coupled with abusive language and a verbal threat to kill him, caused the debtor to suffer humiliation and fear for his personal safety, is liable for the mental suffering caused thereby, though no battery was committed.

[Ed. Note.—For other cases, see Assault and Battery, Cent. Dig. § 53; Dec. Dig. § 38.*]

3. EVIDENCE (§ 123*)—RES GESTÆ.

Statements by a debtor, who had been unlawfully restrained and threatened by his creditor, made to his wife immediately after the

occurrence and to a third person about 10 minutes later while he was laboring under excitement and mental distress, are admissible as a part of the res gestæ in an action against the creditor for false imprisonment and assault.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 351–368; Dec. Dig. § 123.*]

Appeal from District Court, Nacogdoches County; James I. Perkins, Judge.

Action by R. H. Lee against John P. Davidson. From a judgment for plaintiff, defendant appeals. Affirmed.

Ingraham & Hodges, for appellant. June C. Harris and King & King, for appellee.

PLEASANTS, C. J. This suit was brought by appellee against appellant to recover damages for false imprisonment and for assault made upon him by appellant. The petition contains the following allegations:

"Plaintiff says that on said 18th day of January, 1910, that he (plaintiff), together with his wife and family, consisting of six children, and his wife's mother, was occupying under a contract of lease with defendant the certain brick building hereinbefore described, and conducting the business hereinbefore stated; that plaintiff had, by reason of misfortune and business reverses which were beyond his control, become indebted to defendant and had failed and was then unable to pay defendant certain installments of rent then due for the rent of said building as per the terms of said contract, all of which the defendant then and there well knew, all of which defendant was from time to time persistently demanding of him. Plaintiff says that on said 18th day of January, 1910, while plaintiff was peaceably and quietly pursuing his affairs, and attending to his private business, and while in his home in said building, defendant came to plaintiff's room and requested plaintiff to accord him an interview in his (defendant's) room in said building, ostensibly for the purpose of discussing a matter of business; that he (plaintiff), relying upon and trusting to the sincerity of defendant's statement, and altogether unconscious of any desire upon defendant's part to do him harm, went to defendant's room as requested by defendant; that, as soon as plaintiff had entered said room, defendant locked and secured the door of said room, which door was the only means of egress or escape from said room, and then and there against plaintiff's will confined plaintiff therein, and then and there without cause or provocation abused plaintiff and denounced him as a dishonest man, a scoundrel, and a rascal, and then and there did with a deadly weapon, to wit, a pistol, assault plaintiff by pointing said pistol at plaintiff's body, as aforesaid, and then and there with his hands assaulted plaintiff, as aforesaid, and roughly and rudely jerked and shoved plaintiff about said room and refused to release plaintiff from said room

or to permit him to escape therefrom; that plaintiff repeatedly requested and begged the defendant to permit him to leave said room, which defendant refused to do, and then and there in a harsh, bitter, cruel, and threatening manner commanded plaintiff to deliver to him then and there all of the money plaintiff had, and told plaintiff then and there that, if he refused to immediately deliver to him (the defendant) said money that he would shoot and kill plaintiff on the spot, and defendant continued for a period of about one hour, by force and with said deadly weapon, to restrain plaintiff in said room and continued repeatedly during said time to assault plaintiff, as aforesaid, by pointing said pistol at plaintiff's body, and demanding of him said money, and abusing plaintiff in a cruel and unmerciful manner.

"Plaintiff says that by reason of said malicious and unlawful assault made upon him by defendant, as aforesaid, and that by reason of said wrongful and unlawful imprisonment of plaintiff against his will in said room by the defendant, and by reason of said threats and demonstrations to murder him by pointing said pistol at his body, abusing and demanding him to pay to defendant said money, that plaintiff was put in fear of his life, was terror stricken, humiliated, and disgraced, and that he suffered great fear and anguish of body and mind; that he, because thereof, suffered a severe nervous shock and great pain of body and mind; that immediately following said occurrence, and continuously since that time, as a direct result of said treatment, assault, and imprisonment by defendant, he has suffered severely from nervous shock and insomnia, and is now, and has continuously since the happening of said transaction, suffered great anguish of mind and is in a continuous fear of his life at the hands of defendant, and because of said threats and abuses, and because of said violent and cruel treatment by defendant, he suffers now from nervous agitation and is so disturbed in mind and body that he is incapacitated to properly attend to his business or of exercising reasonable judgment in ordinary business affairs, and has continuously since the 18th day of January, 1910, and is now, in a disturbed and agitated condition of mind and body and suffers from nervousness and sleeplessness, because thereof, all of which plaintiff charges is the direct and proximate result of said assaults, imprisonment, abuses, and cruel, unmerciful, and unlawful conduct and treatment of plaintiff by defendant, because of all of which plaintiff says that he has been actually damaged in the sum of $4,000.

"Plaintiff alleges and charges that said acts and conduct toward him by the defendant, as aforesaid, were willful, malicious, inhuman, cruel, and wickedly and wantonly done, and without cause or provocation com-

---

mitted upon him by defendant; that said conduct by the defendant was in pursuance of a malicious and cruel design upon defendant's part to injure, mistreat, and intimidate and to humiliate, disgrace, and terrorize plaintiff and subject him to shame and disgrace before his fellow men; that, because of such cruel and malicious acts so willfully and maliciously done, plaintiff is entitled to recover of and from the defendant exemplary damages in the sum of $6,000.

"Wherefore plaintiff prays that upon a final hearing hereof plaintiff have judgment against defendant for his damages, both actual and exemplary, as hereinbefore alleged, for cost of suit, and for special and general relief."

The defendant's answer contains a general demurrer, special exceptions, and a general denial, and also specially denies each of the material allegations of the petition.

The trial in the court below with a jury resulted in a verdict and judgment in favor of plaintiff for the sum of $225.

We copy from appellant's brief the following testimony of appellee giving an account of the occurrence upon which the charges of false imprisonment and assault are based: "Davidson came to my room and said he wanted to see me and for me to come down to his room when I got through. He just said he wanted to see me on business. I went to Davidson's room. When I got there, I knocked, and Davidson opened the door and said, 'Come in,' and I went back into the second room, and he stopped at the door and came on behind me. He has two double rooms with double doors between them. Mr. Davidson said, 'My attorneys tell me you are going to leave the building,' and he said it in a rough voice, and I said, 'Yes, I intend going.' And he said: 'Well, you have not fixed the furniture yet. You have not had those brick put back like you said you would, and you have not had the house cleaned up.' And I said, 'I have not gone yet, Mr. Davidson, and I will attend to it before I leave.' And he said next, 'You are cutting wood in my pasture there, and you know you have not got any right for that.' And I said, 'I think I have.' And he said, 'You know you have not got any right to, and you had just as well move the dirt out of there as to cut that wood.' And I said, 'I don't think so.' And he said, 'You have got cartridges to kill me with, and we can settle it now.' And I told him I had not bought any cartridges, and 'I don't care to settle it.' And he said, 'I would rather you would settle it now.' And I said, 'No, I don't want to.' And he said, 'You were going to kill me.' And I said, 'Well, I did buy cartridges, but did not say I was going to kill you.' And he said: 'Lee, you are not an honest man. You have got my money in your pocket, and you won't pay me.' And I said: 'I have not got your money. That is my wife's money, and I am not going to pay you.'

And then I got up, and I said: 'Mr. Davidson, I won't discuss this with you any more. I will leave.' And he said: 'You will not leave. You will pay me before you get out of here, or I will kill you.' And I got to the door, and the door had three locks on it, and I turned the upper lock and the second lock before he got up to me. I heard him open something, and I looked and he was just in the act of jerking the pistol out of the dresser drawer. I had hold of the door and had turned two of the locks in trying to get out. But the door did not come open; it was locked. I turned then, and he jerked the pistol out and pulled it down on me and said, 'Pay me my money, or I will kill you,' and I said, 'Mr. Davidson, I am not going to pay that,' and he said again, 'Pay me or I will kill you,' and we both looked at each other, and I said again, 'I won't pay you,' and I said, 'Mr. Davidson, I came in here to make you a proposition, but I will not do it now,' and he grabbed the pistol, and I said, 'You know I am not armed,' and he said, 'Take this one,' and I said, 'No, I am not going to do it,' and he put the pistol back into the drawer and grabbed me and said, 'Come back here and tell me what that proposition is,' and made me sit down, and he said: 'What is that proposition? You are not treating me like a gentleman.' And I told him, 'I will not do it,' and he said, 'Lee, you are a dishonest scoundrel,' and said, 'Settle this with me,' and I told him, 'No, I will not do it,' and he said, 'Sit down,' and I told him that I would not, and he came and unlocked the door and said that he had locked it to keep my wife from coming in. To the best of my knowledge the pistol was cocked. I suppose he was about three feet from me when he presented the pistol. I only told him twice that I wanted to get out of the room. I only made two efforts to open the door. I could not see how he unlocked it. I don't know whether it was a Yale lock or not. I had a shotgun in my room. While I was in the room it seemed to me that every nerve I had in me was strung to its utmost. When he pulled that pistol on me, there was kinder of a cold shudder run through me, and I just glanced at the pistol and looked at Mr. Davidson all the time. As near as I could express it, when I looked at him, well I don't know how to express it, it was greed and passion that I could see in his face, and at the second time his passion had given away to fear, and I could see that Mr. Davidson was not going to kill me; but the first time I looked at him when he pulled the pistol down on me, I don't know how to define what I thought. I thought about his going to kill me. I did not know whether he was going to kill me or not. It was about one hour, or one hour and a half, after I got out of that room before I went to bed. I suppose you would define the purpose that I went to bed for over-prostration. The effect that the transaction

in the room physically was that it just creat- ed a nervous prostration for a while, and mentally I was worried after that, and have been worried ever since. I don't believe Mr. Davidson is ever going to say, 'Lee, this world is too little for us both.' It prostrated me. I was scarcely able to walk for a day or two. That physical prostration and weak- ness that I felt was for possibly a week, and it was for days and nights that I scarcely slept. When I would go to bed I would sleep for possibly an hour or two."

This testimony sustained the material al- legations of the petition. It was contradict- ed in some material particulars by the tes- timony of the appellant; but the jury have by their verdict determined the conflict in the testimony in appellee's favor, and their finding upon the issues of fact raised by the evidence is conclusive.

The first and second assignments of error complain of the refusal of the court to give special charges requested by appellant in which the jury were instructed to return a verdict for the defendant on the ground that the evidence failed to show that plaintiff had received any physical injury and was, there- fore, not entitled to recover any damages.

The third and fourth assignments complain of the refusal of special charges submitting to the jury the question of whether the plain- tiff had received any physical injury, and instructing them that if they found he had received no such injury they should find for the defendant.

[1] There is no merit in any of these as- signments. The rule that damages cannot be recovered for mental suffering unaccompa- nied by physical injury is not applicable when the wrong complained of is a willful one in- tended by the wrongdoer to wound the feel- ings and produce mental anguish and suffer- ing, or from which such result should be reasonably anticipated, as a natural conse- quence.

The cases of Railway Co. v. Hayter, 93 Tex. 239, 54 S. W. 944, 47 L. R. A. 325, 77 Am. St. Rep. 856, Railway Co. v. Trott, 86 Tex. 412, 25 S. W. 419, 40 Am. St. Rep. 866, and Railway Co. v. Mitchell, 25 Tex. Civ. App. 197, 60 S. W. 892, cited by appellant, do not sustain his contention. In each of these cases it is held that damages cannot be recovered for mere fright caused by the negligent act or omission of a railway com- pany, when such fright is neither attended nor followed by any physical injury result- ing therefrom. This distinction between these cases and the instant case is obvious.

[2] That a creditor could unlawfully re- strain the person of his debtor and by the use of a deadly weapon in a threatening man- ner, coupled with abusive language and a verbal threat to take his life, cause such debtor to suffer humiliation and fear for his personal safety, and escape liability for dam- ages for the injury and mental suffering so

caused on the ground that no battery was committed and no physical injury inflicted, is a proposition repugnant to right and justice and one which finds no support in the au- thorities.

The fifth and sixth assignments complain of the ruling of the court in admitting in evidence the testimony of Mrs. Lee and of J. C. Harris, repeating statements made to them by appellee as to what occurred be- tween him and appellant at the time of the assault. The objection made to this testimo- ny was that it was hearsay. The testimony to which this objection was made, as shown by the statements in appellant's brief, is as follows: Mrs. Lee testified: "He (appellee) appeared excited, and I asked him what was the matter. He said Mr. Davidson had thrown a pistol on him and said he would kill him." Mr. Harris testified: "Mr. Lee came to my office and said he wanted to speak to me privately. I noticed that he was very much agitated, and he told me that he was in trouble. I asked him what was the matter, and he told me that he owed Mr. Davidson some money, and that he had lock- ed him up in the room and told him if he did not pay him he would kill him."

[3] The record shows that, as soon as ap- pellee got out of appellant's room, he went to his own room and told his wife what had happened, and after a short conversation with her went at once to consult Mr. Harris, whose office was not more than 300 yards from appellee's residence. His conversation with Harris occurred about 10 minutes after he left appellant's room.

We think the statements of Lee made at the time and under the circumstances shown by the record were admissible as res gestæ. Tested by the rule laid down in the case of Railway Co. v. Anderson, 82 Tex. 519, 17 S. W. 1039, 27 Am. St. Rep. 902, if the declara- tions of Lee made to his wife and to Harris were made "under such circumstances as would raise a reasonable presumption that they were the spontaneous utterance of thoughts created by or springing from the transaction, and so soon thereafter as to ex- clude the presumption that they were the result of premeditation or design," they were admissible as res gestæ. We think the declarations meet this test. The statement testified to by Mrs. Lee was made immediate- ly after the occurrence, and that testified to by Harris within about 10 minutes. The statements were identical, and the appear- ance and manner of appellee showing his excitement and mental distress were cor- roborative of the truth of his statements. It is hardly conceivable, under the circum- stances, that the statements were the result of premeditation or design. We think the assignments should be overruled.

It is unnecessary to discuss the remaining assignments. None of them presents any er-

ror, and each of them is overruled without discussion.

We are of the opinion that the judgment of the court below should be affirmed, and it has been so ordered.

Affirmed.