Charles D. McDONALD, et al.,
Plaintiffs-Appellees,

v.

Charles M. BENNETT and James V. Belvedere, Defendants-Appellants.

Charles M. BENNETT,
Plaintiff-Appellant,

v.

Charles D. McDONALD, et al.,
Defendants-Appellees.

No. 80–1124.

United States Court of Appeals,
Fifth Circuit.

May 7, 1982.

---

James Belvedere, pro se.

Brice A. Tondre, McFarland & Tondre, Houston, Tex., for Charles M. Bennett.

Porter & Clements, J. Eugene Clements, Barry Abrams, Houston, Tex., for McDonald.

Conner, Odom & Clover, C. E. Clover, Jr., Sealy, Tex., for John R. Selman and Citizens State Bank.

Before CLARK, Chief Judge, GOLDBERG and WILLIAMS, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

Charles Bennett and James Belvedere owned most of the stock in Englewood Industries, a Colorado-based company that manufactured polyurethane refrigeration panels. In 1975, they began making overtures to Charles McDonald seeking his participation in this business. McDonald was a recently retired executive of a construction firm. In 1976, Bennett and Belvedere proposed to McDonald that the three form a new company to market Englewood's products abroad. McDonald put up two thousand dollars, but the others never contributed and "Englewood International" never materialized.

In late 1976, Belvedere twice visited McDonald in Texas, again trying to solicit investment in Englewood Industries. Englewood apparently needed an infusion of fresh capital because it was ailing financially, laden with poor credit and tangible assets under a threat of foreclosure. Nevertheless, Belvedere and Bennett ultimately prevailed upon McDonald to participate by misrepresenting to him the company's financial condition. Under the terms of agreements reached on December 7–8, 1976, McDonald agreed to buy all of Bennett's stock in Englewood. At the same time, the three remaining shareholders—McDonald, Belvedere, and Sam Arnold—approved a reorganization of the stock, giving McDonald a fifty-one percent controlling interest. McDonald agreed to pay Bennett $25,000 "in part payment" and to guarantee, with Belvedere, the gradual repayment of $148,000 in loans that Bennett purportedly had advanced to Englewood.

In addition to this new interest in Englewood, McDonald owned all of the stock in the Sealy International Technical Corporation (SITCO), which he has described as a holding company for his investments. Having purchased what he believed to be a controlling interest in Englewood, McDonald attempted to shore up its finances by drawing on the better established credit of SITCO. He arranged to purchase the principal assets of Englewood—its operating equipment at the Colorado plant—from Business Development, the corporation that had been leasing the equipment to Englewood. In order to finance this transaction, SITCO borrowed $125,000 from Citizens State Bank in Sealy, Texas, using the Englewood assets as collateral. The money left over from this purchase apparently went toward Englewood's operating expenses and the purchase of Bennett's stock.

Thus, by the time McDonald began to discover that Englewood's position was more precarious than he had been led to believe, he and his close corporation had committed substantial sums toward its success. McDonald finally demanded an accounting and informed Belvedere that Belvedere would receive none of the reorganized Englewood stock until he could account for funds that he had withdrawn from the corporation. Relations among McDonald, Bennett, and Belvedere rapidly deteriorated. Bennett and Belvedere informed McDonald that the "memorandum agreements" of December 7–8 had never been consummated, and that they, with Arnold, remained the sole shareholders. McDonald was, by their reckoning, at best a creditor without authorization to act for the company.

Rejecting subsequent proposals for a settlement, in which he would have bought out the others and assumed full control of the then-foundering corporation, McDonald filed suit in Texas district court and obtained a temporary restraining order against interference from Bennett and Belvedere in the affairs of Englewood. Bennett then declared McDonald in default on the $148,000 loan repayments and attempted to accelerate payment of the balance. McDonald later asserted that this internal wrangling further debilitated Englewood. Whatever the reasons, creditors forced the corporation into bankruptcy in 1978, and McDonald lost his investment.

McDonald's lawsuit, commenced in state court in 1977, alleged violations of both federal and state securities laws, including the Texas stock fraud statute, Tex.Bus. & Com.Code Ann. § 27.01 (Vernon 1968), and Rule 10b-5 of the Securities Exchange Act

of 1934, 15 U.S.C. § 78j(b). McDonald also advanced theories of recovery based on common law fraud, breach of contract, wrongful interference with a contract, slander of title, and wrongful acceleration of a debt by Bennett. Belvedere and Bennett removed the action to federal court on diversity grounds. Bennett then filed counter- and cross-claims against Belvedere, McDonald, Citizens State Bank, John Selman (McDonald's banker at Citizens State), and SITCO, maintaining that all had conspired to strip Englewood of its assets and defraud him out of his shares, and that McDonald remained liable on the $148,000 debt to him. Similarly, Belvedere eventually filed claims against all but Bennett, seeking recovery of his alleged losses in the venture.

The trial court directed a verdict dismissing Selman and Citizens State. From the jury's answers to sixty-nine special issues, the court fashioned a judgment holding Bennett and Belvedere jointly and severally liable to McDonald in the amount of $402,-805.[1] The court entered a separate additional award against Bennett of $100,000 for wrongful acceleration and of $150,000 in punitive damages. An additional $150,000 in punitive damages was awarded against Belvedere. The court dismissed all claims against McDonald.

Bennett and Belvedere have contended on appeal that none of the legal theories of recovery advanced by McDonald support the damages awarded. Primarily, they insist that the trial court erroneously permitted McDonald to recover damages actually sustained by the corporation, SITCO, and that the fraud, if any, was not a "securities" violation. Following oral argument,

we remanded this case to the district court for additional findings on damages. Having reviewed the supplemented record with care, we conclude that the jury's findings on liability are justified by the evidence. However, the damage award is excessive in three respects. Accordingly, we hold that McDonald must either agree to a remittitur, as proposed below, or proceed to a new trial.

### I. Causes of Action Belonging to SITCO

Bennett[2] contended at trial, and urges now, that McDonald was not entitled to recover any monies spent and lost by his corporation, SITCO, in its dealings with Englewood. According to Bennett, at least $155,000 of the sums claimed and recovered by McDonald in this action belonged to SITCO or a successor corporation, EBSCO. At some point between his purchase of the Englewood Interest and the trial, McDonald merged the wholly-owned SITCO into the Energy Building Systems Corporation (EBSCO), in which he owns seventy percent of the stock. In arguing that only EBSCO could recover the $155,000 or any other sums that it or SITCO had lost in Englewood's demise, Bennett relied on the familiar principle that an individual shareholder cannot sue for damages sustained by the corporation.

> Such action must be brought by the corporation, not alone to avoid a multiplicity of suits by the various stockholders and to bar a subsequent suit by the corporation, but in order that the damages so recovered may be available for the payment of the corporation's creditors, and for proportional distribution to the stockholders as dividends, or for such other

1. This portion of the judgment breaks down as follows:

| | |
|---|---|
| $375,000 | Out-of-pocket damages plus obligations |
| −148,000 | Debt allegedly owed by McDonald to Bennett but voided by court. |
| 227,805 | Subtotal |
| + 173,000 | Benefit-of-bargain damages based on Tex. Bus. & Com. Code Ann. § 27.01 |
| 400,805 | Subtotal |
| + 2,000 | Breach of "Englewood International" agreement |
| $402,805 | |

The award of $375,805 in out-of-pocket damages is further broken down and explained in note 5, *infra*, and the accompanying text.

2. We refer to the defendant-appellants as "Bennett," since only Bennett filed a brief. Belvedere, who represented himself at trial and on appeal, has requested that we consider Bennett's brief on his behalf and, insofar as the

purposes as the directors may lawfully determine.

*Commonwealth of Massachusetts v. Davis,* 140 Tex. 398, 168 S.W.2d 216, 211 (1942), *cert. denied,* 320 U.S. 210, 63 S.Ct. 1447, 87 L.Ed. 1848 (1943).

McDonald rejoins that more recent Texas caselaw permits recovery by a defrauded purchaser of a business, even though a portion of the funds used as consideration originated in the purchaser's wholly-owned corporation. Central to McDonald's position, both at trial and in this appeal, is *Heinrichs v. Evins Personnel Consultants, Inc.,* 486 S.W.2d 935 (Tex.1972). Heinrichs had purchased a franchise for $16,000 using a check drawn on a corporation owned solely by him and his wife. On learning that the franchise's books had been doctored prior to sale and that the business was unprofitable, Heinrichs sued for fraud to rescind the purchase agreement and for damages. The Texas Supreme Court reversed the decision of the court of civil appeals, based on *Davis, supra,* that only Heinrichs' close corporation, from which the check had issued, could recover the purchase price. Examining the problem as one of whether the Heinrichs' corporation was an "indispensable party" under Tex.R.Civ.P. 39 rather than as a problem of corporate law, the Court found an absence of evidence to support an inference that Heinrichs' corporation had any interest in the franchise. As for its provision of funds for the purchase, the Court reasoned, "it may have furnished the money because it already owed Heinrichs that amount of money or it may have advanced the sum as a loan to Heinrichs. The fact of any rights in [the corporation] rests wholly in supposition." 486 S.W.2d at 936.

The district court resolved the issue in favor of McDonald and submitted the following jury instruction proposed by McDonald:

> You are instructed as the sole shareholder and owner of SITCO, Mr. McDonald was entitled to utilize SITCO funds in his personal dealings with Englewood, Belvedere and Bennett. You also are instructed that you should consider any such funds advanced, utilized, or spent by Mr. McDonald as personal funds which McDonald was entitled to utilize as his own. Accordingly, you are further instructed that you should consider monies McDonald advanced by and through his corporation, SITCO, when ascertaining the amount of damages sustained by McDonald, if any, as well as the amount of consideration paid by Mr. McDonald, if any.

In the judgment that resulted, McDonald recovered the $125,000 borrowed by SITCO from Citizens State, plus interest paid on the loan.[3]

We conclude that the above instruction was error and that McDonald in fact was not the party entitled to sue for some or all of the damages sustained through the loss of this sum. The facts of *Heinrichs* are not, as McDonald suggests, "virtually indistinguishable from the facts of this case." Crucial to the Texas Supreme Court's resolution in *Heinrichs* was the lack of any evidence, other than the single check, to connect the wholly-owned corporation with the purchased franchise. "[The corporation] was not a party to the franchise agreement," the Court pointed out, "and there was not proof that it held a lien upon or any kind of a claim to the franchise." 486 S.W.2d at 936.

The evidence of SITCO's entanglement with Englewood Industries is considerably

---

legal issues impact on both defendants identically, we have done so.

**3.** Ironically, SITCO/EBSCO was a party to this suit, since Bennett filed a counterclaim against McDonald naming the corporation as a codefendant. The corporation apparently neglected this opportunity to file a claim in its own behalf. EBSCO's presence in the lawsuit, however, does not affect our consideration of Bennett's question. The question presented is not, as in *Heinrichs,* whether the corporation is an indispensable party, but whether the sole shareholder is entitled to recover damages sustained by his corporation.

more compelling. Obviously, McDonald's purchase of Bennett's stock with a check drawn on SITCO does not depart immediately from the letter or spirit of *Heinrichs.* From this point on, however, our facts take leave of that decision. SITCO purchased Englewood's equipment from Business Development for $57,000. SITCO entered into an agreement with Englewood to lease the assets back to Englewood until 1986 for $1,905.71 per month, a lease totalling $160,-079.64 in value. SITCO assigned this lease to Citizens State Bank as collateral for the $125,000.00 loan that McDonald used to pay Bennett, Business Development, and other Englewood creditors. McDonald himself testified that these assets, purchased and assigned by SITCO, were the only assets Englewood possessed. Finally, as late as November of 1977, EBSCO/SITCO was pledging the Englewood assets as part of the collateral, subject to Citizens States' prior lien, for a $388,000 loan from the First National Bank of Brenham. Although McDonald characterized SITCO as a holding company, a loan proposal drawn up in July 1977 described EBSCO as a corporation formed to manufacture polyurethane panels. This document repeatedly referred to the new corporation as "EBSCO/Englewood."

Considering this clear history of involvement by SITCO/EBSCO in the fortunes of Englewood, we do not see how any other party is entitled to recover the sums spent by SITCO in this venture and allegedly lost in Engelwood's fall. Our extension of *Heinrichs* to these facts, on a groundless presumption that SITCO assumed all of these obligations as a "loan" to McDonald, would effectively nullify the strict formalities and obligations that long have accompanied permission to enjoy the benefits of the corporate device in Texas.

That SITCO's involvement with Englewood paralleled that of its sole owner, McDonald, or that SITCO's losses inured to his detriment, we have no doubt. Still, established Texas law on recovery for damages to a corporation, closely held or otherwise, is clear:

As a general rule an action to redress or prevent injuries to the corporation cannot be maintained by a stockholder or the body of stockholders in their own names or in the corporate name, but the action must be brought by, and in the name of, the corporation itself. This is true, although the injury to the corporation may incidentally result in the destruction or depreciation of the value of the stock. *And the fact that the complaining stockholder is the owner of all or substantially all of the capital stock does not enlarge his rights in this respect.* The stockholders cannot as individuals recover on a cause of action vested in the corporation, although all unite in the action.

*Stinnett v. Paramount-Famous Lasky Corporation,* 37 S.W.2d 145, 149 (Tex.Comm'n. App.1931, holding approved) (quoting 14 C.J. § 1444 C) (emphasis added).

An exception to the rule permits a shareholder to sue and recover damages for "wrongful acts which are not only wrongs against the corporation but also violations of duties arising from contracts or otherwise and owing directly to the injured stockholders." *Id.* McDonald insists that his action falls within this exception since he, rather than SITCO, was the party obligated to purchase Bennett's shares under the contract of December 7, the original agreement induced by the fraud and from which all other damages flowed. This argument is only persuasive in part, however. The agreement with Bennett merely arranged for the sale to McDonald of a controlling interest in Englewood for $25,000 and other guarantees; it mentioned nothing about the purchase and leasing of assets or the raising of loans. These substantial extensions of credit to Englewood were accomplished by SITCO, and the fact that it was McDonald, private investor, who led McDonald, director and owner of SITCO, into catastrophe does not make the two investors legally indistinguishable.

In *Cullum v. General Motors Acceptance Corporation,* 115 S.W.2d 1196 (Tex.Civ.App. —Amarillo 1938, no writ), a Texas court undertook a lengthy exposition of the ex-

ception claimed by McDonald. Cullum was the sole shareholder in a Chevrolet dealership, which, as part of its agency agreement, financed sales to its customers through the General Motors Acceptance Corporation (GMAC). The dealership deteriorated when GMAC repudiated its agreements with Cullum and instructed customers to pay GMAC directly, intimating that Cullum was dishonest. Cullum sought damages both to the defunct dealership and to his other investments and business reputation. The Texas court sustained dismissal of the suit, emphasizing that Cullum's right to recover certain personal losses sustained through GMAC's alleged misconduct did not give rise to a blanket action on behalf of his corporation as well:

> The [*Stinnett*] rule is not sufficiently comprehensive to include within such suits damages arising from wrongful acts *merely because the acts complained of resulted in damage both to the corporation and to the stockholder.* Such a suit is permitted only when the wrongs are such as to give to the stockholder personally a right of action. If the injuries complained of are such as to give to the corporation a cause of action upon damages occasioned to it, the stockholder has no right to bring suit therefore, *but if there is a contract or other liability of which the stockholder personally is the beneficiary,* the cause of action arises to him as with any other cause of action he might have under the same circumstances.

*Id.* at 1201 (emphasis added). The court went on to distinguish a number of cases in which a plaintiff shareholder had been allowed, under the exception, to recover damages from a breached agreement naming a corporation's shareholders as direct beneficiaries.

We have been similarly scrupulous in strictly observing the *Stinnett* rule. In *Schaffer v. Universal Rundle Corporation*, 397 F.2d 893 (5th Cir. 1968), we followed *Stinnett* and *Cullum* in reversing a personal judgment obtained by the sole owner of a wholesale plumbing supply business. Both the shareholder *and* his corporation had

sued for damages resulting from a breach of contract and anticompetitive misconduct. This court reversed a general verdict of $70,000 for the "plaintiffs (plural)," finding that no cause of action reposed in Schaffer as an individual. We then refused to consider the misjoinder as mere harmless error requiring only dismissal of Schaffer as a party. Noting "the probability that the jury based its verdict disproportionately on a consideration of the damages suffered by Schaffer individually," we remanded the case for a new trial on both liability and damages and directed the dismissal of Schaffer as a party-plaintiff.

In the case before us, McDonald, unlike Schaffer, sustained identifiable losses as an individual as well as in his corporate role. Certainly he was a proper party to the suit. Still, his having suffered private losses in the venture did not give him the right to recover *all* sums lost by his corporation in the same fraud, any more than it would have enabled him to recoup the losses of a defrauded corporation in which he had no interest whatsoever. Whatever their identity in interest, McDonald and SITCO remained separate legal entities. Having chosen to conduct his financial affairs through use of the corporate vehicle, with all of the benefits traditionally conferred by that device, he cannot simply shrug off the corporate mantle at the courthouse steps and demand recovery of all his losses as a private individual. SITCO, after all, assumed financial obligations to various creditors upon which only it, not Charles McDonald, was legally liable. SITCO, therefore, is the only party that should recover for any harm to its financial condition suffered as the result of a commercial fraud.

We are persuaded, however, that McDonald properly may recover the $25,000 that he agreed to pay Bennett for the Englewood shares. McDonald, rather than SITCO, was to assume ownership of the shares for which the $25,000 formed a part of the consideration. McDonald was the express beneficiary, therefore, of this particular expenditure by SITCO. We need not speculate on why the corporation as-

sumed this payment for McDonald so long as its liability was one "of which the shareholder personally is the beneficiary." *Cullum, supra*, 115 S.W.2d at 1201. To this extent, we conform to the result reached in *Heinrichs* by permitting a shareholder to recover the value paid by his close corporations, on his behalf, in the purchase of a second business. The slender reed of *Heinrichs* cannot support, however, the precarious weight of an extension allowing McDonald to reclaim as personal funds the sums paid out by SITCO—for all the record shows—in its *own* behalf. Thus, we must limit McDonald's recovery to the $25,000 stock purchase price[4] plus the sums spent by McDonald personally in this ill-fated venture.

Conveniently, the damages that the jury based on McDonald's personal expenditures are discernible from the record. The $375,805 granted McDonald in each of special issues 11 (fraudulent inducement to a contract), 30 and 32 (securities violations), 38 and 39 (breach of agreement), 41 and 43 (interference with contractual relations), and 45 (slander of title) could have been

4. McDonald also can recover the $12,000 in interest that he personally paid on the money borrowed by SITCO to pay for Bennett's stock. *See* note 5, *infra*, and accompanying text. That McDonald, rather than SITCO or EBSCO, paid the interest on this sum reinforces our impression that the $25,000 stock payment was more in the nature of a personal obligation, even though SITCO, like the close corporation in *Heinrichs*, provided that purchase price. SITCO/EBSCO, however, clearly paid the more sizeable interest on the other monies borrowed by SITCO and invested in the operation of Englewood.

5. The following is a reproduction of the Plaintiff's Exhibit 198, except that we have italicized the amounts that McDonald is *not* entitled to recover:

| Paid By | | Money In |
| --- | --- | --- |
| *SITCO* | | *$57,000 Business Dev* |
| *SITCO* | | *43,000 Operating Cap* |
| SITCO | | 25,000 Bennett stock |
| Pl.Tr.Ex. 125 | | 30,000 Operating Cap |
| C.D. McD. | $12,000 | |
| | | 42,900 Interest |
| *SITCO & EBSCO* | *30,900* | |
| C.D. McD. | | 1,629 Bankruptcy lawyers |
| C.D. McD | | 3,400 |

derived only from the identical figure computed for the jury in Plaintiff's Exhibits 198 and 199.[5] Using the plaintiff's own table as a basis for breaking down the award, therefore, we find that the $375,805 figure included $100,000 ($57,000 + $43,000) marked "paid by SITCO" (not counting the $25,000 paid for Bennett's stock), as well as an additional $30,900 in interest denoted "paid by SITCO/EBSCO." The $148,000 marked "Bennett 'debt'" was subtracted from the $375,805 figure by the trial judge after he voided, as part of the judgment, this debt owed by McDonald to Bennett but never paid. The rest of the damages, including operating capital, bankruptcy and accountant fees, travel expenses, and litigation costs—a total of $101,905—came out of McDonald's own pockets. Thus, combining the sums paid out by SITCO and EBSCO, we conclude that the court's final award to McDonald of $227,805 in actual damages resulting from the fraud (see note 1, *supra*), was excessive in the amount of $130,900, and that McDonald should have recovered $96,095 in out-of-pocket losses.[6]

| Paid By | Money In |
| --- | --- |
| C.D. McD. | 2,476 Accountant |
| C.D. McD | 3,400 Travel Expense |
| | $208,805 Total |
| *Nothing paid* | *$148,000 Bennett "debt"* |
| In litigation, nothing paid | 24,000 M.L. Foss |
| | $172,000 Total |

Plaintiff's Exhibit 199 is as follows:

Difference Between Represented Value & Actual Value

| | | |
| --- | --- | --- |
| $208,805 | — | Cash In |
| 172,000 | | Obligations |
| $380,805 | | Total |
| – 5,000 | | Salvage |
| $375,805 | | |

6. McDonald's actual expenses of $101,905 must be diminished by the $5,000 in salvage value that the jury accepted in reaching its award of $375,805. *See* Plaintiff's Exhibit 199, note 5 *supra*. This leaves $96,905 in out-of-pocket damages resulting from the fraud.

## II. *Wrongful Acceleration*

The district court submitted to the jury the following special issue (No. 46): "Did Charles M. Bennett wrongfully accelerate and declare due certain alleged indebtedness of Englewood Industries and Charles D. McDonald to himself? The jury answered that Bennett had wrongfully accelerated the debt, then proceeded, as directed, to the following instruction:

> If, but only if, you find that Charles M. Bennett accompanied his efforts, if any, to collect his alleged debt with a course of deliberate and unreasonable harrassment of McDonald designed to embarrass, humiliate, and subject him to approprobrium [sic], you may also consider compensation for mental anguish suffered by Charles D. McDonald. Otherwise, you may not.

In Special Issue No. 47, the jury awarded McDonald $100,000 as reasonable compensation for the wrongful acceleration.

As Bennett points out,[7] the above portion of the charge contained no explanation of what constitutes a wrongful acceleration. Indeed, we are at a loss to discern precisely what cause of action Special Issues 46–47 presented as the basis for recovery of this substantial sum. McDonald's First Amended Original Complaint stated a cause of action for "intentional infliction of emotional injury, negligence, fraud, [and] creditor harrassment," concluding with a request for "an amount exceeding $100,000." The complaint made no mention of "wrongful acceleration," however, and instead emphasized the entire "course of conduct and negligent, illegal and intentional acts" alleged to have been committed by both Bennett and Belvedere.

McDonald, in defending these special issues and this instruction (which he submitted to the court in his proposed charge) and the resultant award, apparently seeks to focus our attention on Texas law prohibiting unreasonable collection efforts by creditors. Leaving aside for a moment the question whether the record provides any evidence of Bennett's having used unrea-

sonable methods to collect the $148,000 debt, we note that the authorities cited by McDonald are wholly inapposite to the charge as given.

The instruction permitting recovery for mental anguish caused by unreasonable collection efforts was taken directly from 17 Tex.Jur.2d, *Damages* § 130 (1960), an authority cited by McDonald in his brief. The Texas authorities annotated in that source show, however, that damages for mental anguish unaccompanied by physical injury are recoverable at common law, if at all, only as a result of the most egregious abuses in debt collection.

In *Davidson v. Lee*, 139 S.W. 904, 907 (Tex.Civ.App.—Galveston 1911, *writ denied*), cited both by McDonald and in Tex. Jur.2d, the court held that damages for mental suffering unaccompanied by physical injury are recoverable "when the wrong complained of is a willful one intended by the wrong-doer to wound the feelings and produce mental anguish and suffering, or from which such result should be reasonably anticipated, as a natural consequence." In reaching this result, however, the court relied on the horrendous facts presented. A landlord had tried to collect unpaid rent from a tenant by trapping him in his apartment, abusing him verbally, shoving him, and threatening him with a pistol. The court apparently was unwilling in 1911 to view nervous prostration as "physical injury" or shoving at gunpoint "a battery," but it concluded that, under the circumstances, preclusion of recovery "on the ground that no battery was committed and no physical injury inflicted in a proposition repugnant to right and justice and one which finds no support in the authorities." *Id.*

The general rule in Texas, nevertheless, is that mental anguish alone is insufficient to sustain a recovery of damages, at common law, for unreasonable collection efforts. *Duty v. General Finance Co.*, 154 Tex. 16, 273 S.W.2d 64 (1954); *Harned v. E–Z Finance Co.*, 151 Tex. 641, 254 S.W.2d 81 (1953); *United Finance & Thrift Corp. v.*

---

**7.** Bennett also properly objected to this portion     of the charge at trial.

*Smith,* 387 S.W.2d 752, 757 (Tex.Civ.App.—Tyler 1965, *writ ref'd n.r.e.*). McDonald refers us to the Texas Debt Collection Act, Tex.Rev.Civ.Stat.Ann. art. 5069–11.01 to 11.11 (Vernon Supp.1980–1981) and to *Ledisco Financial Services, Inc. v. Viracola,* 533 S.W.2d 951 (Tex.Civ.App.—Texarkana 1976, no writ), a case decided under the Act. It is true that damages in an action for harassment or abuse brought under the Act can be sustained by proof of mental anguish alone. *Ledisco,* 533 S.W.2d at 957. However, the Act applies only to debts incurred by a "consumer," defined as "an individual who owes or allegedly owes a debt created primarily for personal, family, or household purposes." McDonald's guarantee to Bennett as partial payment of his securities debt hardly qualifies as a consumer transaction.

■ We conclude, therefore, that the portion of the charge touching on "wrongful acceleration," which actually sought to present a cause of action for unreasonable collection of a debt, was defective in its failure to require a finding that McDonald suffered some physical injury and that this injury was proximately caused by Bennett's collection efforts. We further conclude that the jury was entitled to instructions on, and definitions of, the standard elements of this tort, whether grounded in negligence or intent. *See, e.g., Employee*

*Finance Co. v. Lathram,* 363 S.W.2d 899, 901 (Tex.Civ.App.—Ft. Worth 1962) *rev'd on other grounds,* 369 S.W.2d 927 (Tex.1963) (approving recovery grounded in negligence where court's charge defined "unreasonable collection efforts" as "efforts which a person of ordinary prudence in the exercise of ordinary care on his part would not have exercised under the same or similar circumstances"). Since the instruction did not "fairly and adequately cover the issues presented," *United States v. Pool,* 660 F.2d 547, 558 (5th Cir. 1981), the jury's award of $100,000 for wrongful acceleration cannot stand.[8]

## III. *The Benefit of the Bargain*

Section 27.01 of the Texas Business and Commerce Code (Vernon 1968) provides a special statutory remedy for fraudulent inducement to a contract involving real estate or stock. Section 27.01(b) provides that "[t]he measure of actual damages is the difference between the value of the real estate or stock as represented or promised, and its actual value in the condition in which it is delivered at the time of the contract." This statutory measure of damages, often referred to as the "benefit of the bargain" rule, was instituted by the Texas Legislature in 1919 as a more severe alternative to the "out of pocket" rule pre-

---

8. Having decided the point on this basis, we merely record our impression that the evidence in this record probably would not support a judgment against Bennett based on unreasonable collection efforts. We note that articles 5069–11.02 and 11.03 of the Texas Debt Collection Act, while not applicable to commercial transactions among businessmen, furnish a convenient summary of the types of conduct deplored and prohibited in earlier cases decided at common law—which, incidentally, almost invariably involved individual borrowers, tenants, or mortgagees beset by the outrageous collection techniques of an institutionalized creditor. None of these statutory provisions appear to describe Bennett's "collection efforts," even if we include his post-acceleration statements to third parties that McDonald was not a shareholder in Englewood.

The record shows that Bennett's collection efforts consisted chiefly of preliminary steps toward this litigation—letters from his attorney, depositions, etc.—all of which were part

and parcel of the disintegrating legal and commercial relationships among the parties. One of McDonald's more detailed allegations is that "he was hospitalized at one point after being subjected to three days of depositions by Bennett's attorney." While discovery can take the form of a withering ordeal, we know of no instance in which the stress created by depositions has formed the basis of a recovery for unreasonable collection efforts.

While we do not suggest that the statutory prohibitions exhaust the possibilities for action at common law or that a businessman may never recover at common law in Texas for unreasonable efforts to collect a commercial debt, we do not believe that Bennett's tactics against another experienced businessman, however unpraiseworthy, overstepped the bounds of commercial decency as hitherto recognized in Texas. Naturally, we refer here only to his alleged "collection efforts," not to the original fraud that created the debt.

viously followed by Texas courts. *See El Paso Development Co. v. Ravel*, 339 S.W.2d 360, 363 (Tex.Civ.App.—El Paso 1960, *writ ref'd. n.r.e.*), for a brief legislative history. Texas courts also have determined, however, that section 27.01 and its predecessor, article 4004 of the old Texas Civil Statutes, supplemented but did not supersede the older common law remedies for fraud. Those remedies provided not only for recovery of the actual or "out of pocket" loss resultant from the false representation, but also for any "pecuniary loss suffered otherwise as a consequence of the recipient's reliance upon the truth of the representation." *Id.* at 365; *see also Sherrod v. Bailey*, 580 S.W.2d 24, 28–29 (Tex.Civ.App.—Houston [1st Dist.] 1979, *writ ref'd n.r.e.*); *Wright v. Carpenter*, 579 S.W.2d 575, 578 (Tex.Civ.App.—Corpus Christi 1979, *writ ref'd n.r.e.*); *Maddox v. Worsham*, 415 S.W.2d 222, 226–27 (Tex.Civ.App.—Amarillo 1967, *writ ref'd n.r.e.*).

Having been instructed on the standard elements of fraud at common law, the jury found that McDonald relied on materially false financial statements delivered by Belvedere, as authorized by Bennett, in entering the agreements of December 7 and 8 to purchase Bennett's stock. It awarded him $375,805 in compensation. As explained in Part I, this figure could only have been derived from McDonald's own computations in his trial exhibits (see footnote 5, *supra* ). Thus, the jury's award for fraudulent inducement obviously included both the $25,000 cash payment for the stock and the $148,000 in obligations guaranteed by McDonald—in sum, the full $173,000 that McDonald agreed to pay for the stock—in addition to the consequential damages permitted at common law.

■ The court also charged the jury, however, on the statutory remedy created by section 27.01. In a series of special issues (numbers 13–23), the jury found that the actions of Bennett and Belvedere satisfied the elements of the statute. When finally asked what sum of money it found "to be the difference between the value of stock in Englewood Industries purchased by McDonald as represented or promised to him and its actual value in the condition in which it was actually delivered to him," the jury answered "$173,000.00." This answer could only represent the jury's determination that the stock value, as represented to McDonald, was $173,000—the $25,000 part payment plus the $148,000 in payment guarantees—whereas the actual value, as delivered, was zero. Contrary to Bennett's protestations, the record amply supports the findings on which this calculation is based. Both the memoranda from the December meetings and the trial testimony of Sam Arnold support an inference that Bennett and Belvedere valued the stock for McDonald at $173,000; moreover, Bennett's own testimony suggests that the stock had little or no value.

■ Nevertheless, the award of $173,000 under section 27.01 was duplicative of the $375,805 assessed separately for the common law fraud. As we have demonstrated, the $375,805 awarded for fraudulent inducement to a contract *included* the $25,000 cash payment (plus interest) and the $148,000 obligation. Quite properly, the trial court subtracted the $148,000 figure from its final judgment since, because of Bennett's refusal to accept further installments once McDonald filed suit, McDonald had never actually paid that sum to Bennett. However, the judgment also absolved McDonald of any further liability for that obligation. Thus, McDonald recouped his actual losses by recovering the $25,000 down payment and obtaining dissolution of the $148,000 debt.

As for the additional "benefit of the bargain" permitted by section 27.01, the simple answer is that there was none. We are mindful that recovery of actual and consequential damages at common law would not necessarily preclude a plaintiff from recovering this additional benefit conferred by statute. Thus, if McDonald had paid $170,000 for worthless stock represented to be worth $173,000, the measure of damages adopted by the statute would entitle him to $3,000 in excess of his "out of pocket" loss. Here, however, the misrepresented value

*equaled* the out-of-pocket expense; that is, the $173,000 in out-of-pocket losses that McDonald recovered at common law exactly match the $173,000 in value for which he bargained.

In effect, therefore, the award of $375,805 enabled McDonald to recover his actual damages from the stock purchase, the benefit of his bargain, *and* his consequential losses. Permitting McDonald a duplicative award of $173,000—$148,000 of which he had never actually paid out—through a mechanical application of section 27.01 was unjust. Of course, the trial court's subtraction of the unpaid $148,000 from the final award precludes McDonald from recovering this portion of the $375,805. He is no more entitled to this $148,000 under section 27.01 however, than he was at common law.

### IV. *Loose Ends*

Having explained our resolution of Bennett's meritorious contentions at length, we will dispose of his other points of error summarily. Bennett offered at trial over sixty transcript pages of objections to the court's charge, and he incorporates them by reference into his brief. Except for those addressed above, we find these arguments wholly without merit.

Furthermore, we conclude that the damages award—except for the amounts noted as damages to SITCO/EBSCO or as duplicative—is supportable by the evidence adduced on the theory of fraudulent inducement to a contract. *See* Part III, *supra.* Thus, we forego discussion of Bennett's complaints regarding the "securities" aspects of the trial.

Bennett's complaints about the court's evidentiary rulings are spurious. For example, he objected at trial to testimony concerning certain communications among the parties aimed at resolving their differences over the business. Urging then that this was inadmissible "offer and compromise" evidence, he continues on appeal that the court erred in not permitting the jury to determine the admissibility of this evidence. Rule 104 of the Federal Rules of Evidence could hardly be clearer in reserving such questions for the court's decision. Similarly groundless is Bennett's contention that the court committed reversible error in refusing to grant a mistrial after "commenting that McDonald was incompetent to read financial statements." The record shows that the court was not impugning McDonald's ability to read statements, but was merely suggesting that counsel reserve their questions on the preparation of Englewood's financial statements for the accountant who had prepared them.

Finally, we conclude that the court did not err in directing a verdict in favor of John Selman and Citizens State Bank, nor in refusing to grant judgment for Bennett as a matter of law. Viewed in the light most favorable to Bennett, the evidence supports the district court's determination that reasonable persons could not have arrived at a finding that Selman and his bank were liable to Bennett for fraud and conversion of Englewood's assets. *See Boeing Co. v. Shipman,* 411 F.2d 365, 374–75 (5th Cir. 1969) (en banc). As for Bennett's demand for judgment, the trial court's instruction to the jury that no dispute existed as to "the guarantee of payment of the notes by Charles D. McDonald and James V. Belvedere in the event of non-payment by Englewood Industries, Inc.; and the non-payment of the notes by Englewood Industries, Inc." hardly lends weight to Bennett's imaginative claim to judgment on the guarantee "as a matter of law." The jury expressly found that McDonald's guarantee had been fraudulently induced, that Bennett had subsequently denied the enforceability of the contract with McDonald, and that Bennett had waived all rights under this agreement. The evidence amply supports these conclusions.

### V. *Conclusion*

We have determined that the district court's award to McDonald was unsupportable in three respects: (1) McDonald was not the proper party to recover the $130,900 of the money put into Englewood by SITCO/EBSCO; (2) the instructions on "wrongful acceleration," on which the jury based an award of $100,000, did not fairly

and accurately present a cause of action to the jury; and (3) the award of $173,000 derived from Tex.Bus. & Com.Code Ann. § 27.01 was duplicative of the actual damages already awarded at common law. Liability for the $130,900 in SITCO funds and the $173,000 awarded under section 27.01 was imposed on Bennett and Belvedere jointly and severally. We conclude, therefore, that the $402,805 awarded against Bennett and Belvedere jointly and severally is excessive in the amount of $303,900, leaving $98,905 in legally supportable damages.[9] Further, the additional $250,000 awarded against Bennett individually is excessive by the $100,000 erroneously awarded for "wrongful acceleration," leaving legally supportable additional damages in the amount of $150,000 as punitive damages. The separate punitive award of $150,000 against Belvedere remains undiminished.

Although we have resolved that the damages cannot stand as calculated, we see no reason to compel a retrial of this long and costly dispute. With the exceptions noted above, the trial below was a fair one. Moreover, those elements of damages that we have been unable to approve are clearly separable from those that withstand inspection.

■ According to long-established practice in the federal courts, an appellate court may "permit the party, in whose favor a verdict or judgment has been returned or entered, to avoid the granting of a new trial on account of error effecting only a part thereof, by entering a remittitur as to such erroneous part, when the court can clearly distinguish and separate the same." *Hansen v. Boyd*, 161 U.S. 397, 411, 16 S.Ct. 571, 576, 40 L.Ed. 746 (1896). *See also Carlton v. H. C. Price Co.*, 640 F.2d 573, 582

n.14 (5th Cir. 1981); *Davis v. Safeway Stores, Inc.*, 532 F.2d 489, 491 n.4 (5th Cir. 1976). This reduction in actual damages does not require our disturbing the jury's award of punitive damages against both defendants. *See, e.g., Flame Coal Co. v. United Mineworkers*, 303 F.2d 39, 46–47 (6th Cir. 1962); *cert. denied*, 371 U.S. 891, 83 S.Ct. 186, 9 L.Ed.2d 125 (1962); *Garland Coal & Mining Co. v. Few*, 267 F.2d 785, 791 (10th Cir. 1959). The punitive damages are neither excessive nor disproportionate when compared to the actual damages for which both defendants remain liable.

"It has long been the law in Texas that the amount of exemplary damages should be reasonably proportioned to the actual damages found." *Southwestern Investment Co. v. Neeley*, 452 S.W.2d 705, 707 (Tex.1970). However, it also "has been repeatedly held that there can be no set rule or ratio as between the amount of actual damages and that of exemplary damages." *First Security Bank & Trust Co. v. Roach*, 493 S.W.2d 612, 619 (Tex.Civ.App.—Dallas 1973, writ ref'd n. r. e.).

In *Neeley*, the Texas Supreme Court found disturbing an appellant's complaint that the court of civil appeals, in drastically reducing an award of actual damages while leaving the punitive award intact, had "permitted the ratio between exemplary damages and actual damages to go from approximately four to one to approximately twenty-eight to one." The Court responded by holding that a court of civil appeals which orders a substantial remittitur of actual damages "is under an obligation to give consideration to the ratio between exemplary and actual damages as established by the jury in passing on the further question of excessiveness of exemplary dam-

---

9. To recapitulate this calculation finally, we have held that McDonald may not recover the following sums awarded by the district court against Bennett and Belvedere, jointly and severally:

| $57,000 | Paid by SITCO to Business Development (see note 5, *supra*). |
| 43,000 | Paid by SITCO for operating capital (see note 5, *supra*). |
| 30,900 | Interest paid by SITCO & EBSCO (see note 5, *supra*). |
| 173,000 | Duplicative award under § 27.01 (see Part III, *supra*). |

$303,900

We subtract this $303,900 from the district court's award of $402,805 (see note 1, *supra*), leaving $98,905. This figure represents McDonald's out-of-pocket loss of $96,905 (see notes 5–6 *supra* and accompanying text) plus the $2,000 awarded by the district court for the breach of the "Englewood International" agreement (*see* note 1, *supra*).

ages." 452 S.W.2d at 708. The Court emphasized that the ratio established by the original award was not of controlling importance, nor must the state appellate courts apply it "to the exclusion of every other consideration." *Id.*

We find the rationale of the Texas Supreme Court in *Neeley* persuasive. In this case, however, we find that a reduction of the punitive damages to comport with the ratio produced by the original judgment is not necessary nor is it just.

First, the $150,000 in punitive damages imposed on each defendant stand in only a three-to-two ratio with the $98,905 in actual damages remaining after remittitur. This is clearly a "proportion" acceptable under Texas law. *See, e.g., Miley v. Oppenheimer & Co.,* 637 F.2d 318, 331–32 (5th Cir. 1981), in which we approved a three-to-one ratio as a rule of thumb for assessing, under Texas law, punitive damages in securities "churning" cases. *See also Maxey v. Freightliner Corp.,* 665 F.2d 1367, 1377 (5th Cir. 1982) (en banc), for a recent discussion of the Texas proportionality requirement.

Second, the jury in this case returned damage figures in response to a number of questions covering numerous legal theories, and the figure "$375,805.00" occurs six times in their answers. But the jury was never asked to add these figures or to calculate any total amount for recovery. In short, the jury merely confronted each separate issue as directed in the charge and could not have known precisely what the end result in damages would be. The trial court later determined the compensatory amount to which plaintiff was entitled, using the jury's answers. Thus, we are satisfied that the jury based its award of $150,000 in punitive damages against each defendant upon a conviction that the conduct described at trial warranted punishment in this amount,[10] and not upon any precise multiplication or division of actual dam-

ages. *Cf. Ogilvie v. Fotomat Corp.,* 641 F.2d 581, 586·87 (8th Cir. 1981) (requiring proportional reduction in punitive damages to match reduction in actual damages where jury's assessment of punitive damages on each of eleven actual damages judgments was exactly four times the actual damages). Since the jury's assessments remain reasonably proportioned to the unremitted actual damages, we decline to disturb them.

We withhold the granting of a new trial, therefore, on the condition that McDonald remit $303,900 of the damages awarded against both defendants and $100,000 of the additional liability imposed upon Bennett singly. This revised judgment will permit McDonald to recover $98,905 in actual damages against Bennett and Belvedere, jointly and severally, an additional $150,000 in punitive damages against Bennett, and another $150,000 in punitive damages against Belvedere.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED with INSTRUCTIONS.

---

10. As the district court told the jury at the end of a lengthy instruction on punitive damages, "Exemplary or punitive damages may be allowed by law in addition to actual damages by way of punishment and as an example for the good of the public, and may also include compensation for inconvenience, reasonable attor-

ney's fees, and other losses too remote to be considered under actual damages." *See Pan American Petroleum Corp. v. Hardy,* 370 S.W.2d 904, 908 (Tex.Civ.App.—Waco 1963, writ ref'd, n. r. e.); *Allison v. Simmons,* 306 S.W.2d 206, 211 (Tex.Civ.App.—Waco 1957, writ ref'd n. r. e.).