**Thomas M. GAUBERT,**
**Plaintiff–Appellant,**

v.

**UNITED STATES of America,**
**Defendant–Appellee.**

**No. 88–1923.**

United States Court of Appeals,
Fifth Circuit.

Oct. 17, 1989.

Abbe David Lowell, Elizabeth C. Brooks, Sean Connelly, Brand & Lowell, Washington, D.C., for plaintiff-appellant.

Jerome A. Madden, Trial Atty., Torts Branch, Civ. Div., U.S. Dept. of Justice, Washington, D.C., for defendant-appellee.

Before GEE, GARZA, and JONES, Circuit Judges

GARZA, Circuit Judge:

This case requires us to further define the scope of the discretionary function exception to the Federal Tort Claims Act. Appellant's case below was dismissed for lack of subject matter jurisdiction. We find the discretionary function exception to the Torts Claims Act inapplicable to certain of the alleged actions taken in this case. However, we find that Gaubert does not have standing to sue for the lost value of his shares, and we must dismiss that part of his suit.

Background

When deciding a motion to dismiss for lack of subject matter jurisdiction under Fed.Rule Civ.Proc. 12(b)(1), we construe the complaint broadly and liberally, although argumentative inferences favorable to the pleader will not be drawn. *Norton v. Larney*, 266 U.S. 511, 45 S.Ct. 145, 69 L.Ed. 413 (1925); *see also* Fed.Rule Civ.Proc. 8(f).

We will also accept as true all uncontroverted factual allegations of the pleadings. *Gibbs v. Buck*, 307 U.S. 66, 59 S.Ct. 725, 83 L.Ed. 1111 (1939). We therefore present the facts of this case, which are alleged in Gaubert's complaint, in light of the above standards.

Appellant Thomas M. Gaubert was, at all times relevant to this case, the largest shareholder and chairman of the board of Independent American Savings Association ("IASA"), a Texas state-chartered and federally-insured savings and loan. From January 1983 through March 1986, IASA grew and its financial health remained good.

In the Fall of 1984, officials at the Federal Home Loan Bank Board ("FHLBB") wanted IASA to merge with a failing Texas thrift, Investex Savings. The closing of this transaction was delayed, however, by an investigation of another S & L in which Gaubert had been involved. In order to resolve this impasse, the FHLBB and Federal Home Loan Bank–Dallas ("FHLB–Dallas") requested that Gaubert sign a neutralization agreement in order to secure Gaubert's effective removal from the affairs of IASA. Gaubert agreed to this proposal. Gaubert was also required, as part of the merger transaction, to personally guarantee that the net worth of IASA would not fall below regulatory minimums. To accomplish this, Gaubert was asked to contribute a personal interest in real estate valued at more than $25 million; Gaubert ultimately lost this property when IASA became insolvent. No other shareholder or director of IASA was required to sign a neutralization agreement, give a personal guarantee, or asked to contribute property.

Officials at the federal agencies then assisted IASA in its merger with Investex by providing regulatory and financial advice. They advised IASA on how it should present the transactions to its shareholders for approval and helped draft proxy statements disclosing Gaubert's neutralization agreement. During this period, IASA was not under a supervisory agreement, receivership, conservatorship, or cease-and-desist order. Rather, the federal involvement came as a result of the inherent persuasive

power of the FHLBB, which no doubt arises from the position of authority it occupies; the government euphemistically refers to this ability to pressure S & Ls as "jawboning."

Officials at FHLB–Dallas next sought the replacement of IASA's management and Board of Directors. In February or March of 1986, the Board was told that FHLB–Dallas would close IASA if it did not actively cooperate with this plan. FHLB–Dallas then searched for and selected the new Board of Directors and officers of IASA. In order to persuade the existing directors and officers to resign, Gaubert was freed from his neutralization agreement in return for his efforts to encourage the IASA Board of Directors to resign and allow FHLB–Dallas to pick the new directors and manage IASA.

All IASA directors tendered their undated resignations, even though no proceedings aimed at obtaining a supervisory agreement had ever been initiated for IASA. In April 1986, the directors were replaced, and a former FHLB–Dallas employee was installed as CEO. The other directors and officers, all selected by FHLB–Dallas, were ultimately elected.

After engineering the resignation and replacement of IASA management, officials at FHLB–Dallas actively involved themselves in IASA's affairs and played an increasingly larger role in the day-to-day operations. FHLB–Dallas officials arranged for the hiring of a consulting company on operational and financial matters and asset management. Advice and recommendations concerning whether, when, and how to place IASA subsidiaries into bankruptcy were given by FHLB–Dallas officials to the IASA Board. Salary disputes between IASA and its senior officers were mediated by FHLB–Dallas, which also reviewed a draft of a complaint in litigation that the Board of Directors contemplated filing. FHLB–Dallas urged that IASA convert from a state-chartered S & L to a federally chartered S & L so that it could become the exclusive government entity with power to control IASA. FHLB–Dallas employees actively intervened with the Texas Savings and Loan Department when the state attempted to install a supervisory agent at IASA.

Shortly after the IASA Board of Directors was replaced, the new directors announced that IASA had over a $400 million negative net worth; this was a surprising development in light of the fact that IASA believed its net worth to be about $74 million positive at the end of 1985. On May 20, 1987, Gaubert filed an administrative tort claim with the FHLBB, FHLB–Dallas, and FSLIC seeking damages in the amount of $75 million for the lost value of his shares, and $25 million for the property he forfeited under the guarantee agreement; that claim was denied by letter dated November 20, 1987. On May 20, 1987, the IASA was placed into the receivership of FSLIC.

Gaubert filed suit individually in United States District Court for the Northern District of Texas under the Federal Tort Claims Act, 28 U.S.C. § 1346, alleging the negligent selection of directors and officers (Count I) and the negligent involvement in day to day operations (Count II) by federal officials. The government moved for dismissal, citing (1) Gaubert's lack of individual standing as a shareholder of IASA, and (2) lack of subject matter jurisdiction as grounds. The district court granted the motion to dismiss for lack of subject matter jurisdiction on September 28, 1988, and did not reach the issue of standing. Gaubert appeals that dismissal here.

*Subject Matter Jurisdiction Under the FTCA*

■ When suing the federal government, a plaintiff must first overcome the bar of sovereign immunity, which establishes that the federal government is not liable for damages resulting from sovereign acts performed by it in its sovereign capacity. *Horowitz v. United States*, 267 U.S. 458, 461, 45 S.Ct. 344, 344, 69 L.Ed. 736 (1925). The Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b), is a limited statutory waiver of the federal government's sovereign immunity. The FTCA authorizes suits against the United States for

injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee or the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b).

The act, however, contains certain exceptions to the federal government's waiver of immunity. One of these exceptions is known as the Discretionary Function Exception, which reads in pertinent part as follows:

The provisions of [The FTCA] shall not apply to—

(a) Any claim based upon an act or omission of an employee of the government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a). The district court concluded that this exception to the FTCA was applicable to this case, and therefore dismissed the suit for lack of subject matter jurisdiction. Gaubert contends that the district court's conclusion was in error, since the actions of the FHLBB and FHLB–Dallas lost the protection of the discretionary function exception when they began to assume operational, day-to-day control over IASA. Analysis of this well-taken point requires us to plumb the depths of Supreme Court decisions in this area; it is to this task which we now turn.

An early case in the Supreme Court applying the FTCA to negligence which can be characterized as being at the "operational level" of governmental activity is *Indian Towing Co. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955). That case involved the negligent operation by the Coast Guard of a lighthouse light, resulting in the running aground of a barge. The Coast Guard argued that the FTCA, by its terms, excluded liability in the performance of activities which private persons do not perform. Thus, there would be no liability for negligent performance of uniquely governmental functions. The Court rejected this argument, noting that the Coast Guard did not have a duty to undertake the lighthouse service, but that "once it exercised its discretion to operate a light ... and engendered reliance on the guidance afforded by the light, it was obligated to use due care to make certain that the light was kept in good working order.... If the Coast Guard failed in its duty and damage was thereby caused to petitioners, the United States is liable under the Federal Torts Claims Act." *Id.* at 69, 76 S.Ct. at 126–27.

Although *Indian Towing* established the applicability of the FTCA to unique and operational activities of government, it is not, contrary to Gaubert's assertions, dispositive of the case at bar. The Coast Guard, in *Indian Towing*, expressly conceded that the discretionary function exception of § 2680(a) was inapplicable. The case did, however, establish the principled distinction between policy decisions and operational actions; this distinction still retains its force today and is dispositive of this case. We next turn to more recent Supreme Court precedent for further analysis of the scope of the discretionary function exception to the FTCA.

An oft-cited Supreme Court decision on the scope of the discretionary function exception was *United States v. Varig Airlines*, 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984); the government primarily relies on this case to support its argument that the discretionary function exception applies here. In *Varig*, families and representatives of passengers who died in a fire aboard a Boeing 707 aircraft sued the Federal Aviation Administration ("FAA") under the FTCA. The suit alleged negligence of the FAA in certifying that aircraft for use in commercial avia-

tion.[1]

The Supreme Court held that the actions of the FAA fell within the § 2680(a) discretionary function exception. Central to the court's holding was its interpretation of the policy behind the exception, which the court expressed as follows: "It is neither desirable or intended that the constitutionality of legislation, the legality of regulations, or the propriety of a discretionary administrative act be tested through the medium of a damage suit for tort." *Varig,* 467 U.S. at 809–10, 104 S.Ct. at 2762. The Court went on to note that "Congress wished to prevent judicial 'second guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Id.* at 814, 104 S.Ct. at 2765.[2] Holding that the decisions made by the FAA regarding proper certification procedure were discretionary, the Supreme Court dismissed plaintiff's suit.

The Supreme Court recently revisited the discretionary function exception in *Berkovitz v. United States,* 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988). That case involved a suit by an infant against the United States under the FTCA for damages resulting from the infant's contracting polio, allegedly as a result of ingesting a polio vaccine. The complaint specifically alleged that the Division of Biologic Standards ("DBS"), then a part of the National Institute of Health, had acted wrongfully in licensing the production of the vaccine. It also alleged that the Bureau of Biologics of the Food and Drug Administration had wrongfully approved release to the public of the particular lot of vaccine in question.

The Supreme Court held that neither of plaintiff's two allegations were barred by the discretionary function exception. With regard to the first allegation—that the DBS had wrongfully issued a license—the Court held that it was not barred because the DBS had issued a license without first receiving the statutorily required data showing how the product, at various stages of the manufacturing process, matched up against regulatory safety standards. Since the DBS did not have statutory discretion to issue a license without receiving the required test data, the discretionary function exception could not bar a suit alleging this failure. *Id.* at ——, 108 S.Ct. at 1961–62, 100 L.Ed.2d at 544–45.[3] With regard to the second allegation of negligence—approving the specific lot for release to the public—the Court likewise held that the

**1.** The first stage of FAA certification is type certification, in which the FAA approves the basic design of the aircraft which a manufacturer wishes to produce. 49 U.S.C. § 1423(a)(2); 14 C.F.R. § 21.21(a)(1). The next step is the issuance of a production certificate, which requires the manufacturer to prove that it has established and can maintain a quality control system to assure each plane produced will meet the design parameters of the type certificate. 14 C.F.R. §§ 21.139, 21.143. After issuance of a production certificate, production of aircraft may begin, but before they are placed into service, an airworthiness certificate must be obtained for each individual aircraft. The airworthiness certificate denotes that the particular aircraft conforms to the specifications of the type certificate, and is in condition for safe operation. 49 U.S.C. § 1423(c). All evaluation of application for certificates is performed by FAA representatives or by properly qualified and appointed private persons. 14 C.F.R. § 183.29.

**2.** The *Varig* Court also sought to breathe new life into the previous case of *Dalehite v. United States,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953) (holding the discretionary function exception applied to a fertilizer explosion which had been produced and distributed under the direction of the United States). The viability of *Dalehite* had been questioned following the Supreme Court's decision in *Indian Towing,* as well as in *Union Trust Co. v. Eastern Air Lines Inc.,* 350 U.S. 907, 76 S.Ct. 192, 100 L.Ed. 796 (1955) (summary affirmation permitting suit under FTCA which alleged negligence of air traffic controllers which caused a midair collision between two aircraft trying to land at Washington National Airport).

**3.** The court noted that, had plaintiffs claimed that the DBS made a determination that the vaccine complied with regulatory standards, but that the determination was incorrect, the analysis of the applicability of the discretionary function exception would be somewhat different. In that event, the question would be whether the manner and method of determining compliance involved agency judgment of the kind protected by the discretionary function exception, which was the issue presented in *Varig.* The Court did not reach this question, however, due to the fact that the actual licensing decision was carried out in violation of statutory directives.

discretionary function exception was not a bar. Central to the Court's reasoning was that the Bureau's inspection policy did not leave room for an official to exercise policy judgment in performing a given act. Since there was no room for policy judgment, the discretionary function exception did not apply. *Id.* at ——, 108 S.Ct. at 1964–65, 100 L.Ed.2d at 547–48.

Unfortunately, the holding in *Berkovitz* is not dispositive of this case. Both allegations of negligent licensing and negligent approval were held to be non-discretionary because of the existence of statutes in both cases which afforded no room for policy judgment. In the case before us, the actions of the FHLBB and FHLB–Dallas were not as closely guided by statute. The real guidance that we obtain from *Berkovitz* is in its discussion of the discretionary function/operational activity dichotomy which was first established in *Indian Towing*. Any doubts about the sustained viability of that distinction were put to rest by the Court in *Berkovitz*, which noted that

> [t]he decision in *Indian Towing* also illuminates the appropriate scope of the discretionary function exception.... The Court stated that the initial decision to undertake and maintain lighthouse service was a discretionary judgment. The Court held, however, that the failure to maintain the lighthouse in good condition subjected the Government to suit under the FTCA. The latter course of conduct did not involve any permissible exercise of policy judgment.

*Id.* at ——, 108 S.Ct. at 1959, n. 3, 100 L.Ed.2d at 542, n. 3.

In this case, FHLBB and FHLB–Dallas officials were not acting pursuant to statute when they acted to assume operational control of IASA through their considerable "powers of persuasion." This fact alone, however, does not insulate them from liability. As should now be clear from our above discussion of Supreme Court precedent, there are two distinct strands of conduct to which the discretionary function exception does not apply. The first are cases where the official is acting pursuant to statute, and therefore has no real discretion, as her actions are pre-ordained by Congress. *See Berkovitz,* 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531; *Collins v. United States,* 783 F.2d 1225 (5th Cir.1986) (failure to reclassify a mine as gassy not protected by § 2680 because regulations mandated reclassification, thus leaving no room for policy judgment).

The second type of conduct not encompassed by the discretionary function exception are those actions which are undertaken outside of the strictures of statutory or regulatory mandates, but which are nonetheless operational in nature. That was the case in *Indian Towing,* and is also the case here. The authority of the FHLBB and FHLB–Dallas to take the actions that were taken in this case, although not guided by regulations, is unchallenged. The FHLBB and FHLB–Dallas officials did not have regulations telling them, at every turn, how to accomplish their goals for IASA; this fact, however, does not automatically render their decisions discretionary and immune from FTCA suits.[4] Only policy oriented decisions enjoy such immunity. *Berkovitz* at ——, 108 S.Ct. at 1959, 100 L.Ed.2d at 541; *Varig,* 467 U.S. at 814, 104 S.Ct. at 2764. Thus, the FHLBB and FHLB–Dallas officials were only protected by the discretionary function exception until their actions became operational in nature and thus crossed the line established in *Indian Towing.*

We discussed the discretionary function exception recently in *B & F Trawlers, Inc. v. United States,* 841 F.2d 626 (5th Cir. 1988). In that case, the Coast Guard seized a ship at sea after discovering marijuana on board. While the ship was being towed

---

4. Judge Brown made this same point in a concurrence in *Collins v. United States,* 783 F.2d 1225 (5th Cir.1986): "[e]very act of a rational being involves some choices—speed up or slow down, turn right or left, put helm port or starboard, go full astern or full ahead, tighten brakes or replace them, glide in or circle, use general anesthetic or local, use a human heart or a JARVIK 7. It is plain that the discretionary function exception of § 2680(a) must be applied with restraint if the Tort Claims Act is to achieve the dual purposes which motivated its enactment." *Id.* at 1233–34.

into port, a fire broke out on board; once in port, the ship was intentionally sunk. Denying the ship owner relief pursuant to the discretionary function exception, this court held that, because the Coast Guard's purpose in towing in the ship was to protect the general public and not the ship owner, the ship owner could not have relied on the Coast Guard to his detriment. Stated another way, the Coast Guard owed no duty of due care to the ship owner since the Coast Guard's actions were not designed to benefit the ship owner.

*B & F Trawlers* is distinguishable from the present case in that the federal regulators here had two discrete purposes in mind as they commenced day-to-day operations at IASA. First, they sought to protect the solvency of the savings and loan industry at large, and maintain the public's confidence in that industry. Second, they sought to preserve the assets of IASA for the benefit of depositors and shareholders, of which Gaubert was one. Because any actions benefitting the first aim would necessarily further the second, Gaubert as shareholder and guarantor falls within the pool of beneficiaries of government action here. The *B & F Trawlers* rule is therefore inapposite.

We now must apply the *Indian Towing* test to the factual allegations of Gaubert's complaint to determine at which point the federal officials lost their § 2680(a) immunity. Clearly, the decision to merge IASA with Investex and seek a neutralization agreement from Gaubert was a policy ori-

ented decision protected by § 2680(a). *See* ¶¶ 12–19 of Amended Complaint. Similarly, the decision to replace the IASA Board of Directors with FHLBB approved persons, and the actions taken to effectuate that decision, are protected under the discretionary function exception. *See* ¶¶ 20–32 of Amended Complaint. The point at which the FHLBB and FHLB–Dallas began to assume operational control, and thus lost the protection of § 2680(a), occurred when they began to advise IASA management and participate in management decisions, including hiring a consultant, directing that IASA convert to a federally-chartered entity, supervising the filing of litigation on behalf of IASA, and other allegations contained in ¶¶ 33–43 of Gaubert's Amended Complaint. We therefore conclude that the district court's dismissal with regard to ¶¶ 12–32 of the Amended Complaint was correct, but that it should not have dismissed ¶¶ 33–43 of the Amended Complaint, as those paragraphs allege negligent operational activities, liability for which is not barred by the discretionary function exception to the FTCA. *Standing*

## Standing

■ The government argues that, even if there exists a cause of action against it under the FTCA, that cause of action belonged to the corporation, and Gaubert as an individual shareholder does not have standing to assert it.[5] Gaubert is suing in his individual capacity, and does not sue derivatively in the name of the corporation.[6]

---

**5.** The government raised this standing challenge in the district court, but the district court did not address the issue because it dismissed Gaubert's claim on other grounds. We have sufficient information in the record on appeal only to allow us to resolve part of this issue.

**6.** Gaubert argues on appeal that, in a prior and separate case arising from the same facts, a district court held that he did not have standing to sue derivatively in the name of IASA. *Gaubert v. Hendricks*, 679 F.Supp. 622 (N.D.Tex. 1988). If this court holds that Gaubert does not have standing to sue individually, Gaubert stresses, we will have effectively precluded any sort of review of federal regulatory action. This point is incorrect. Gaubert's prior derivative suit was filed in the name of IASA against officers and directors of IASA. The court held

that Gaubert would have had standing to sue prior to the IASA being placed in receivership, had he made sufficient demand on the directors or alleged demand futility. However, once IASA was placed into receivership, FSLIC acquired the right to bring that suit under 12 U.S.C. § 1729(b). Gaubert did not, in that suit, allege a demand upon FSLIC.

In the case at bar, Gaubert in his individual capacity sued FHLBB, FHLB–Dallas, and FSLIC; he has not sought to bring a derivative action against the federal officials. A derivative action is not precluded when a bank is placed into receivership; rather, any demand to bring suit must be made upon the receiver or agency possessing the right to assert the corporation's claims. *Federal Deposit Insurance Corp. v. American Bank Trust Shares, Inc.*, 558 F.2d 711 (4th Cir.1977); *Landy v. Federal Deposit Insur-*

Generally, individual shareholders have no separate right to sue for damages suffered by the corporation which result solely in the diminution of the value of the corporation's shares. *Commonwealth of Massachusetts v. Davis*, 140 Tex. 398, 168 S.W.2d 216 (1943); *United States v. Palmer*, 578 F.2d 144 (5th Cir.1978). One rationale behind this prohibition rests on principles of judicial economy. A corporation can protect its shareholder's interest by suing in the corporate name, and if the suit is successful the proceeds will inure to the benefit of the corporation; this increases the value of the individual shares in proportion to the amount of the recovery. Compare this to a situation where all shareholders sue in their individual capacities, which achieves the same resultant recovery, but requires our legal system to process hundreds or thousands of suits, rather than one suit in the name of the corporation.

Another rationale for the prohibition is fairness to creditors of the corporation. Common shareholders are usually at or near the bottom of the corporate financial pecking order. First come the secured then unsecured creditors, then the bondholders in order of preference, then the preferred shareholders, and lastly the common shareholders. Any recovery for injuries to the corporation is paid into the corporation, and the various creditors, bondholders, and equity-holders are "paid" in that order. Were common shareholders allowed to sue directly and individually for damages to the value of their shares, we would be allowing them to bypass the corporate structure and effectively preference themselves at the expense of the other

persons with a superior financial interest in the corporation.[7]

Responding to the above concerns, most states vest the authority to pursue or decline suits for injuries to the corporation in the board of directors, and this decision is usually protected by the business judgment presumption. Texas law is especially stringent in this regard: a corporate shareholder does not have an individual cause of action for personal damages caused solely by a wrong done to the corporation. *Davis*, 168 S.W.2d at 221. However, Texas makes an exception to this general rule: a corporate stockholder may have an action for personal damages for wrongs done to him as an individual stockholder "where the wrongdoer violates a duty arising from contract or otherwise and owing directly by him to the stockholder." *Davis*, 168 S.W.2d at 222; *accord Stinnett v. Paramount–Lasky Corp.*, 37 S.W.2d 145, 149–51 (Tex.Comm'n App.1931, holding approved). Texas, however, puts stringent restrictions on this right of action:

> The [exception] is not sufficiently comprehensive to include within such suits damages arising from the wrongful acts *merely because the acts complained of resulted in damage both to the corporation and to the stockholder*. Such a suit is permitted only when the wrongs are such as to give to the stockholder personally a right of action. If the injuries complained of are such as to give to the corporation a cause of action upon damages occasioned to it, the stockholder has no right to bring suit therefore, but if there is a contract or other liability of which the stockholder personally is the beneficiary, the cause of action arises to

---

*ance Corp.*, 486 F.2d 139 (3d Cir.1973), *cert. denied*, 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974); *Womble v. Dixon*, 585 F.Supp. 728 (E.D.Va.1983), *aff'd in part & vacated in part*, 752 F.2d 80 (4th Cir.1984). While this may entail a demand that the federal agencies sue themselves, it is also possible to allege demand futility. In this case Gaubert has not chosen this path, and therefore his argument that our decision, which denies him standing in his individual capacity for the lost value of his shares, will preclude effective review of federal banking officials must fail.

**7.** The Texas Supreme Court has expressed this concern regarding proper apportionment of the recovery between creditors and equity-holders. "Such actions must be brought by the corporation, not alone to avoid a multiplicity of suits by the various stockholders and to bar a subsequent suit by the corporation, but in order that the damages so recovered may be available for the payment of the corporation's creditors, and for proportional distribution to the stockholders as dividends, or for such other purposes as the directors may determine." *Commonwealth of Massachusetts v. Davis*, 140 Tex. 398, 168 S.W.2d 216, 221 (1942).

him as with any other cause of action he might have under the same circumstances.

*Cullum v. General Motors Acceptance Corp.*, 115 S.W.2d 1196, 1201 (Tex.Civ.App. —Amarillo 1938, no writ) (emphasis supplied); *also quoted in McDonald v. Bennett*, 674 F.2d 1080, 1086 (5th Cir.1982).

■ Gaubert first argues that he has individual standing as a result of the neutralization agreement which he signed. The terms of that agreement recited that, in consideration of the FSLIC discontinuing its review of other transactions in which Gaubert was involved, Gaubert would not serve as a director, officer, agent or employee of IASA. Moreover, Gaubert agreed not to participate in any way in the affairs of IASA or its subsidiaries, and not to vote the common stock that he owned. The agreement expressly reserved to Gaubert, however, the right to sell all or part of his shares. As a result of this agreement, Gaubert argues that he was prevented from protecting his agreement at the very time federal officials began to assume day to day control over IASA, and as a result he suffered unique injury separate and distinct from all other IASA shareholders.

We find this standing argument unpersuasive. While this court, for the purpose of review, accepts Gaubert's factual allegations as true, we differ with his characterization of their legal import. The neutralization agreement was a contract, supported by adequate consideration. Gaubert has not alleged in his complaint a breach of that contract, fraudulent inducement, or any other set of facts which would give him a *personal* cause of action based on the agreement, *separate and apart* from his FTCA allegations against FHLBB and FHLB–Dallas. Gaubert suffered no injury as a result of the neutralization agreement that was not suffered by all the other IASA shareholders—the loss of the value of their shares. This being the case, Texas law does not permit Gaubert an individual cause of action against the FHLBB and FHLB–Dallas. Moreover, Gaubert was not required to sit idly by while FHLBB and FHLB–Dallas officials ran his bank into

the ground; at all times, he had the ability, which was expressly reserved in the neutralization agreement, to sell his shares at market value and invest the proceeds elsewhere. We therefore conclude that the neutralization agreement does not give Gaubert standing as an individual to recover the lost value of his shares, and therefore dismiss Gaubert's action in that regard for lack of standing.

■ Gaubert has also alleged that the guarantee agreement, which he was "required" to sign in order to effectuate the merger, gives him an independent cause of action. Gaubert pledged property valued at about $25 million, which he ultimately lost when the IASA's financial situation deteriorated. Gaubert may have a personal cause of action against FHLBB, FHLB–Dallas, and FSLIC for causing the deterioration of IASA resulting in the loss of his property under the guarantee agreement. Unfortunately, we do not have sufficient information in the record to allow us to pass on whether Gaubert has a cause of action in this regard, as it may depend on whether there was an express or implied promise as part of the guarantee that the federal officials would not negligently cause the deterioration of the corporation. We therefore remand Gaubert's action for loss of property valued at $25 million to the district court to determine whether a valid claim is presented. As a point of clarification, if Gaubert is found by the district court to have a cause of action for the lost property, he may not use that cause to assert standing to sue for the $75 million lost value of his shares.

*Conclusion*

The order of the district court with regard to subject matter jurisdiction is AFFIRMED IN PART and REVERSED IN PART. Gaubert's claim for the lost value of his shares is DISMISSED for lack of standing, and his claim for $25 million in lost property is REMANDED for further consideration.