**In re ENRON CORP., et al.**

**No. 02 Civ. 4159(AKH).**

United States District Court, S.D. New York.

Oct. 22, 2002.

508

Kirby, McInerney & Squire, Jeffrey Squire, New York City, Bragar, Wexler, Eagel & Morgenstern, Lawrence P. Eagel, New York City, Stoll, Stoll & Brody, Howard Longman, New York City, for Appellants.

Weil, Gotshal & Manges, Diane Harvey, New York City, for Debtor–Appellee.

## OPINION AND ORDER REVERSING BANKRUPTCY COURT

HELLERSTEIN, District Judge.

In November of 2001, as Enron was sliding into financial trouble, it signed a Merger Agreement with Dynegy, one of its main competitors. Before the merger was completed, Dynegy withdrew from the agreement, claiming that its withdrawal was permitted by the Agreement because of the occurrence of a materially adverse condition in Enron's financial affairs. Now Enron is in bankruptcy and Enron's shareholders, claiming that Dynegy breached the Merger Agreement, seek to sue Dynegy to enforce rights specifically awarded to them by the Agreement. The shareholders filed suit in the U.S. federal court in the Southern District of New York and in the Texas District Court, a state court.

The Bankruptcy Court, however, has enjoined the shareholders' suit pursuant to the automatic stay provision of the Bankruptcy Code, 11 U.S.C. § 362(a), finding that the shareholders do not have standing to sue and their claims are derivative and belong to Enron. (R. at 323.). Having reviewed the record and having heard additional argument, I reverse the holding of the Bankruptcy Court. I hold that the Enron shareholders have a separate and independent right of action under the Merger Agreement and may therefore proceed with their claims against Dynegy.

## I. *Background*

On November 9, 2001 Enron, in the wake of its well publicized financial crisis, entered into a Merger Agreement with its competitor, Dynegy, Inc. and Dynegy Holdings, Inc. ("Dynegy"). The Merger Agreement provided that Enron's debts would be assumed by Dynegy, that Dynegy would invest $1.5 billion dollars in preferred stock issued by Enron's Northern Natural subsidiary, and that Enron's shareholders would be issued shares in Dynegy in a certain percentage relative to shares owned by Dynegy's shareholders.

On November 28, 2001, Dynegy announced the termination of the merger, but also exercised an option under the Agreement that gave it control of the Northern Pipeline. Dynegy alleged that its termination of the merger was due to misrepresentations by Enron and a violation of the Material Adverse Effect provision contained in the Agreement. Shortly thereafter, Enron was downgraded by the credit rating agencies to speculative or "junk" status. With the merger now off, Enron faced little other choice than to file for bankruptcy.

On December 2, 2001, Enron filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the Southern District of New York. Contemporaneously with Enron's bankruptcy filing, Enron also commenced an adversary proceeding against Dynegy, seeking (i) actual damages in an amount of $10 billion for Dynegy's material breach of the merger agreement, (ii) a declaration that Dynegy breached the merger agreement, and (iii) an award of actual damages in an amount to be proved at trial based on what Enron claimed was Dynegy's unlawful exercise of the option that gave it control over the Northern Pipeline.

A little over two weeks later, on December 20, 2001, a shareholder class action suit, *Pearl v. Dynegy Inc*, No. 01 Civ. 11652, was commenced in the United States District Court for the Southern District of New York against Dynegy for its breach of the Merger Agreement. A similar class action suit, *Shapiro v. Dynegy, Inc.*, Cause No.2002–00080 (128th Dist. Ct., Harris County) was commenced in Texas District Court, a state court, on January 3, 2002. The shareholders' suits seek specific performance of the part of the Merger Agreement that was directly to benefit them and/or money damages. The shareholders claim that they are third-party beneficiaries under the Merger Agreement.

On February 25, 2002, Enron filed a motion in the Bankruptcy Court to enjoin the further prosecution of the shareholders' suits, arguing that even if the shareholders were third-party beneficiaries of the Merger Agreement, their claims were derivative, and therefore the property of the bankruptcy estate.[1] After hearing oral argument on the issue, on April 12, 2002, Bankruptcy Judge Arthur Gonzalez issued an oral opinion agreeing with Enron's arguments and granting Enron's motion for a stay. His ruling was embodied in an April 19, 2002 order, providing that the stay should be enforced and directing dismissal of the shareholder actions. In compliance therewith, both actions were voluntarily dismissed. The shareholders then appealed to the District Court.

On August 29, 2002, Enron and Dynegy entered into a settlement agreement for $92 million. The settlement releases Enron's claims against Dynegy; it does not purport to release the shareholders' claims.

---

[1]. The merits of these shareholder suits are not relevant to this appeal. The only issue of this appeal is whether or not the shareholders'

## II. *Jurisdictional Basis and Standard of Review*

██ Pursuant to 28 U.S.C. § 158(a), this Court has jurisdiction to hear the shareholders' appeal from the final order of the Bankruptcy Court. Under Federal Rule of Bankruptcy Procedure 8013, the District Court reviews the Bankruptcy Court's findings of fact under a "clearly erroneous" standard and its legal conclusions *de novo*. *In re Bonnanzio*, 91 F.3d 296, 300 (2d Cir.1996); *Bell v. Alden Owners, Inc.*, 199 B.R. 451, 457 (S.D.N.Y.1996). Both parties agree that the decision of the Bankruptcy Court was based only upon the Court's interpretation of the Merger Agreement; no extrinsic evidence was considered. Thus, the issue before this Court is a legal one, which the Court will review *de novo*. *Golden Pac. Bancorp v. FDIC*, 273 F.3d 509, 515 (2d Cir.2001) ("The interpretation of an unambiguous contract . . . is . . . a question of law reserved for the court."); *In re 105 East Second St. Assoc.*, 1999 WL 179371, at *3, 1999 U.S. Dist. LEXIS 4616, at *11 (S.D.N.Y. Mar. 31, 1999) ("[C]onstruction of the underlying contract language will . . . be reviewed *de novo*.").

## III. *Applicable Law*

██ Under 11 U.S.C. § 362(a), a petition in bankruptcy operates as a stay of "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." Section 541(a) provides that the commencement of a bankruptcy case creates an estate comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a). This bankruptcy es-

suits are embraced by the automatic stay of 11 U.S.C. § 362(a).

tate includes "any causes of action possessed by the debtor." *Seward v. Devine*, 888 F.2d 957, 963 (2d Cir.1989). Thus, the issue here is whether the shareholders' claims against Dynegy under the Merger Agreement are derivative and thereby possessed by Enron, or whether the shareholders' claims are separate and independent, so that only the shareholders may vindicate the rights provided to them in the Merger Agreement, in which case they may proceed.

■ In order to determine whether the shareholders' claims belong to the estate, and hence can be asserted only by the trustee, the Court must turn to state law. *In re Granite Partners*, 194 B.R. 318, 324 (Bankr.S.D.N.Y.1996) ("State law determines which claims belong to the estate, and hence, can be asserted by the trustee."); *see also In re Van Dresser Corp.*, 128 F.3d 945, 947 (6th Cir.1997) ("Whether a creditor has sole right to a cause of action is determined in accordance with state law."). Since the Merger Agreement between Enron and Dynegy was governed by Texas law, Texas law controls.

■ Generally, under Texas law, if a corporation suffers damages, the corporation, and not its shareholders, has the right to sue the wrongdoer; the shareholders do not have a separate right to sue even though the injury to the corporation may cause the value of their shares to be diminished. *Gaubert v. United States*, 885 F.2d 1284, 1291 (5th Cir.1989); *United States v. Palmer*, 578 F.2d 144 (5th Cir. 1978); *Massachusetts v. Davis*, 140 Tex. 398, 168 S.W.2d 216 (1942); *see also In re Granite Partners*, 194 B.R. at 325 ("Where a corporation suffers an injury, and the shareholders suffer solely through a diminution in the value of their stock, the claim belongs to the corporation."). As a matter of law, a right of action for injury to the property of a corporation or for destruc-

tion of its business is vested in the corporation, not a shareholder, even though the harm may result in loss of earnings to the shareholder. *Fed. Deposit Ins. Corp. v. Howse*, 802 F.Supp. 1554, 1562 (S.D.Tex. 1992). Thus a corporate shareholder has no individual right of action for personal damages caused solely by a wrong done to the corporation. *Id.; Faour v. Faour*, 789 S.W.2d 620, 622 (Tex.App.1990).

Nevertheless, Texas makes an exception to this general rule: a corporate shareholder may have an action for personal damages "where the wrongdoer violates a duty arising from contract or otherwise and owing directly by him to the stockholder." *Davis*, 168 S.W.2d at 222; *Gaubert*, 885 F.2d at 1291. The wrong must be such as to give the stockholders personally the right of action:

> The [exception] is not sufficiently comprehensive to include within such suits damages arising from the wrongful acts merely because the acts complained of resulted in damage both to the corporation and to the stockholder. Such a suit is permitted only when the wrongs are such as to give to the stockholder personally a right of action. If the injuries complained of are such as to give to the corporation a cause of action upon damages occasioned to it, the stockholder has no right to bring suit therefore, but if there is a contract or other liability of which the stockholder personally is the beneficiary, the cause of action arises to him as with any other cause of action he might have under the same circumstances.

*Cullum v. Gen. Motors Acceptance Corp.*, 115 S.W.2d 1196, 1201 (Tex.Civ.App.1938); quoted in *Gaubert*, 885 F.2d at 1291–92; *McDonald v. Bennett*, 674 F.2d 1080, 1086 (5th Cir.1982). Thus, if this Court is to determine that the Enron shareholders have an individual right to sue, it must

determine that the Merger Agreement makes the shareholders personal and independent beneficiaries of the Agreement.

## IV. *The Merger Agreement & Third-Party Beneficiary Claims*

### A. *Terms of the Merger Agreement*

The Merger Agreement between Enron and Dynegy provides, among other things, that upon consummation of the merger, each outstanding share of Enron common stock would be exchanged for the equivalent of 0.2685 shares of Dynegy common stock. As a result of this exchange, Dynegy's stockholders would own approximately 64% and Enron's stockholders approximately 36% of the combined company following the merger. Dynegy also agreed as part of the merger transaction to assume Enron's debts and to invest $1.5 billion dollars in preferred stock issued by Enron's Northern Natural subsidiary, which money was to be "upstreamed" to Enron.

The shareholder appellants claim that the Merger Agreement gives them their own right to sue Dynegy for repudiating its obligations under the Merger Agreement. They rely on Article 4 as it is incorporated in Section 10.3. Article 4 provides that the shareholders will receive a percentage of Dynegy shares. Section 10.3 of the Agreement explicitly recognizes that this provision, along with two others, which the Agreement refers to as the "Third–Party Provisions," confer "rights, remedies, [and] obligations ... under or by reason" of the Agreement to third parties.[2] Section 10.3 also provides that these Third–Party Provisions "may be enforced by the beneficiaries thereof." Thus, the Merger Agreement clearly provides third-party beneficiaries, including the shareholders, the right to enforce the provisions of the Agreement that benefit them.

Debtor-appellee argues that even if this is so, the shareholders' right to enforce those provisions benefitting them did not accrue. Under Article 4 and Section 1.3 of the Merger Agreement, Enron's issued and outstanding shares were not to be converted to shares of Dynegy before the "Effective Time," "the time that Dynegy and Enron shall have agreed upon and designated." In addition, the debtor-appellee argues, Section 8.1 of the Merger Agreement provides that Enron shareholders were not to be entitled to shares of Dynegy stock until the merger had been approved by both Dynegy and Enron's shareholders and the appropriate regulatory authorities, and none of these approvals had occurred. The debtor-appellee contends therefore that shareholders should not be able to sue if Enron's and Dynegy's merger did not occur, or if, pursuant to

---

**2.** Section 10.3 in pertinent part states:

Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto ... without prior written consent of the other parties. Subject to the preceding sentence, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

Notwithstanding anything contained in this Agreement to the contrary, except for the provisions of Article 4, Section 7.13 and Section 9.5(a) and except as provided in any agreements delivered pursuant hereto (collectively, the "Third–Party Provisions"), nothing in this Agreement ... is intended to confer on any person other than the parties hereto or their respective heirs, successors, executors, administrators and assigns any rights, remedies, obligations or liabilities under or by reason of this Agreement. The Third–Party Provisions may be enforced by the beneficiaries thereof....

Section 7.13 of the Agreement indemnifies directors, officers, trustees, and fiduciaries of Enron and Dynegy; Section 9.5(a) describes the effects of termination on Enron and Dynegy, as well as on certain third parties to the Agreement.

Section 9.1 of the Agreement, Enron and Dynegy had agreed to call off the merger prior to the Effective Time. However, as I reason below, the issue is not whether or not the Effective Time had been reached. If Dynegy breached its contractual obligations to the Enron shareholders before the Effective Time, as the Enron shareholders allege, they then and there had, under Texas law, the right to sue in their own right, and that is what they purport to do in their lawsuits.

### B. *Interpreting the Merger Agreement*

■■■■ Under Texas law, the Court "must examine the entire writing in an effort to harmonize and give effect to all provisions of the contract so that none will be meaningless." *Bush v. Brunswick Corp.*, 783 S.W.2d 724, 728 (Tex.App.1989). "[T]he intention of the contracting parties is of controlling significance in determining whether parties are third party beneficiaries. In determining the intention of the parties, [the Court] must presume that the parties contracted only for themselves and not for the benefit of third parties, unless it clearly appears that such was the intention of the contracting party." *Id.* at 727–28 (internal citation omitted). The Merger Agreement at issue here clearly exhibits the parties' intention to contract for the benefit of third parties. Section 10.3 explicitly states that the third-party provisions of the contract may be enforced by third parties.

■■■■ Thus if Dynegy repudiated the Merger Agreement, shareholders have a right to sue in order to enforce those provisions of the contract that benefit them. Under general principles of contract law, repudiation of an agreement before a party has committed a breach by non-performance, and before that party has received all of the consideration due to

it, gives rise to a claim for damages for total breach. Restatement (Second) of Contract Law § 253 (1981); *Pollack v. Pollack*, 23 S.W.2d 890, 892 (Tex.Civ.App. 1929) (holding that where defendant repudiated contract, plaintiff " 'had the right to elect to treat the contract as absolutely and finally broken by the defendant; to maintain his action, once for all, as for a total breach of the entire contract' ") (quoting *Pierce v. Tenn. Coal, Iron & R.R. Co.*, 173 U.S. 1, 19 S.Ct. 335, 43 L.Ed. 591 (1899)); *see also Long Island R.R. Co. v. Northville Indus. Corp.*, 41 N.Y.2d 455, 463, 393 N.Y.S.2d 925, 362 N.E.2d 558, 563 (1977) ("[I]f one party to a contract repudiates his duties thereunder prior to the time designated for performance and before he has received all of the consideration due him thereunder, such repudiation entitles the nonrepudiating party to claim damages for total breach"). Dynegy's withdrawal from the Merger Agreement, alleged by the Enron shareholders to constitute a repudiation, triggered the shareholders' right as third-party beneficiaries to claim damages for breach of the provisions of the Agreement that benefitted them. *See* Restatement (Second) of Contracts § 304 (1981).

The designation of the "Effective Time" in Article 4 of the Merger Agreement therefore placed no limit on this right. The Bankruptcy Court's argument that such a reading "would give shareholders standing to take whatever action they deemed necessary to protect third-party rights even if the parties to the Agreement determined, after signing the Agreement, to call off the contemplated merger prior to the Effective Time" (R. at 322–23) is nonsensical. Section 9.1 of the Merger Agreement provides that the Agreement may be terminated at any time prior to Effective Time by the mutual consent of Dynegy and Enron, not by the unilateral

determination of one of them. And, of course, that is also common sense, for one party to a contract may not call off an obligation owed to the other. Restatement (Second) of Contracts § 311 (1981) (Promisee and promisor mutually, not singly, "retain power to discharge or modify the duty by subsequent agreement"). If Enron and Dynegy discharged their agreement by mutual consent pursuant to Section 9.1, Enron's shareholders, as third-party beneficiaries, might have no standing to enforce the Agreement. However, if Dynegy unilaterally and unlawfully repudiated the Merger Agreement, as the Enron shareholders allege, then those shareholders, as third-party beneficiaries of the Agreement, possess standing to sue for damages. *See* Restatement (Second) of Contracts § 346, Comment (c).

The question then becomes whether the shareholders' claims are derivative of Enron's claims or exist separately and independently of those claims.

### C. *Shareholders' Separate and Independent Right of Action*

■■■■■ In deciding whether shareholders may bring their own, direct action, a court must look to the "nature of the wrong," not at the mere existence of an injury. *Fed. Deposit Ins. Corp.*, 802 F.Supp. at 1561 (quoting *Schoellkopf v. Pledger*, 739 S.W.2d 914 (Tex.App.1987)). In particular, a shareholder may seek direct relief in its own favor against a third party where that party's wrong inflicts an injury on the shareholder's rights rather than on the corporation's rights. *In re Granite Partners*, 194 B.R. at 325. This can occur in two situations: where the allegedly wrongful conduct violates a separate duty to the complaining shareholder independent of the fiduciary duties that the wrongdoer owes to all of the shareholders, or where the conduct causes an injury to the plaintiff distinct from any injury to the corporation. *Id.* at 325.

■■■■ Here, if we look at the "nature of the wrong," it becomes apparent that appellants' injuries are "distinct and separate" from the injuries sustained by Enron. Enron was to benefit from the Merger Agreement by having its debts assumed; Enron's shareholders were to benefit by becoming shareholders of Dynegy. These are distinct and separate benefits; therefore the injuries sustained by their loss are distinct and separate. *See id.* (acknowledging that "a shareholder who suffers an injury particular to itself can maintain an individual action even though the corporation also suffers an injury from the same wrong").[3]

A look at the settlement agreement between Enron and Dynegy illustrates this point nicely. That agreement, under which Dynegy is to pay Enron $25 million and will allow Enron to keep $67 million that is in escrow, releases Dynegy only from claims made against it by Enron; it does not release the shareholders' claims.[4]

---

**3.** In this respect, I reject appellee's argument that the shareholders' injuries cannot be considered "distinct and separate" because Texas law recognizes only two different types of contract damages, direct and consequential damages, *United States ex rel. CMC Steel Fabricators, Inc. v. Harrop Const. Co.*, 131 F.Supp.2d 882 (S.D.Tex.2000). While it may be the case that both Enron's and its shareholders' claims can be characterized as "direct" and "consequential," such characteriza-

tions do not look at the "nature of the wrong" each party alleges, *Fed. Deposit Ins. Corp.*, 802 F.Supp. at 1561, and therefore are not helpful in determining whether the claims are distinct and separate.

**4.** The existence of the settlement agreement does not make the claim before this court moot. While "the settlement of an individual claim typically moots any issues associated with it," *United Airlines, Inc. v. McDonald*, 432 U.S. 385, 400, 97 S.Ct. 2464, 53 L.Ed.2d

Thus, the settlement addresses the injuries sustained by Enron in not having Dynegy assume its debts. The settlement agreement does not address the injuries that are particular to the shareholders in being deprived of their right to become shareholders of Dynegy. The shareholders' claims are therefore separate and distinct from those of Enron.

## V. *Conclusion*

For the reasons stated, I hold that the Enron shareholders have standing directly to sue Dynegy under the terms of the Merger Agreement. Because their claims are separate and independent from Enron's claims, they should not have been stayed under 11 U.S.C. § 362(a). The order of the Bankruptcy Court is therefore reversed.

SO ORDERED.

---

423 (1977)(Powell, J., dissenting), the agreement does not treat the independent claims of the Enron shareholders. At oral argument, counsel for the debtor acknowledged this as well as the fact that the agreement would not bar shareholders from bringing suit. (Tr. at 6–8.) "[A]n actual case or controversy" therefore remains. *See Allen v. Wright*, 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984).