MARTIN OPERATING
PARTNERSHIP,
Plaintiff

v.

UNITED STATES of America,
Defendant.

Civil Action No. 4:12–cv–3483.

United States District Court,
S.D. Texas,
Houston Division.

Signed May 13, 2014.

Kuldeep S. Brar, Frederick William Mahley, Strasburger & Price LLP, Houston, TX, for Plaintiff.

Michael Wayne Kerns, U.S. D.O.J., Washington, DC, for Defendant.

## *ORDER*

VANESSA D. GILMORE, District Judge.

Pending before the Court is Defendants', United States and United States Coast Guard's ("USCG") (collectively, "Defendants") Motion to Dismiss. **(Instrument No. 25).**

### *I.*

#### A.

This is a claim for damages asserted under the Suits in Admiralty Act ("SAA"), 46 U.S.C. §§ 30901–30918 [1] and the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346. Plaintiff Martin Operating Partnership, LP ("Martin" or "Plaintiff") is a Texas limited partnership that owns and operates a tank barge named the Ponciana which was scheduled to be inspected by the USCG on March 4, 2011, in Tampa, Florida. (Instrument No. 1 at 1, 3). Before the inspection, Martin requested that it be allowed to conduct a gas-free operation. The USCG denied Martin's request shortly before the operation and scheduled inspection. (Instrument No. 1 at 2–3). Martin alleges that the USCG imposed undue regulatory requirements on its barge, the Ponciana, causing damages in violation of the SAA and FTCA. (Instrument No. 1 at 1).

#### B.

Martin is a Texas limited partnership that owns and operates a tank barge named the Ponciana. (Instrument No. 1 at 1). The Ponciana was scheduled to undergo a USCG inspection on March 4, 2011, in Tampa, Florida. (Instrument No. 1 at 3). In October of 2010, Martin notified the USCG that it intended to perform a gas-free operation on the Ponciana prior to its inspection. (Instrument No. 1 at 2). During the proposed operation, isobutene gas would be released from the Ponciana's tanks into the atmosphere through a flare system. (Instrument No. 1 at 2). Martin believed that the operation was necessary to ensure the safety of the USCG's inspectors during the Ponciana's upcoming inspection. (Instrument No. 1 at 2).

The USCG did not raise any concerns regarding the proposed gas-free operation, and consequently Martin proceeded with its plans. (Instrument No. 1 at 2). Martin obtained authorization from the Florida Environmental Protection Commission to conduct its gas-free operation at International Ship Repair's facility in Tampa. (Instrument No. 1 at 2–3). On February 26, 2011, the Ponciana embarked from Texas to Florida to conduct the gas-free operation and undergo the USCG inspection. (Instrument No. 1 at 3). On March 2, 2011, the USCG notified Martin that it could not conduct the gas-free operation, advising them that pursuant to 33 C.F.R. pt. 127, they were required to conduct the gas-free operation at a certified facility equipped to conduct operations involving the transfer of liquid hazardous gases. (Instrument No. 1 at 3). Martin informed the USCG that the operation would not involve a transfer of liquid hazardous gas. (Instrument No. 1 at 3). However, on March 4, 2011, the USCG issued a Captain of the Port Order ("COTPO") requiring Martin to conduct its gas-free operation at a certified facility. (Instrument No. 1 at 4).

1. In Martin's complaint, it cites to 46 U.S.C. §§ 741–752 however, the correct citation for the SAA is 46 U.S.C. §§ 30901–30918.

In response to the COTPO, Martin arranged to conduct its gas-free operation at Sea-3, a certified facility in Florida. (Instrument No. 1 at 4). However, on March 7, 2011, the USCG notified Martin that it could not conduct its gas-free operation at Sea-3 because the flare system it intended to use during the operation had not been certified pursuant to 33 C.F.R. pt. 154. (Instrument No. 1 at 4). Martin and Sea-3 contacted the USCG to argue that the operation was safe and that 33 C.F.R. pt. 154 was inapplicable to this operation, but the USCG refused to retract its decision. (Instrument No. 1 at 4). Subsequently, on March 11, 2011, the USCG rescinded its COTPO, acknowledging that 33 C.F.R. pt. 127 was not applicable to the gas-free operation because it did not involve the transfer of liquid hazardous gases. (Instrument No. 1 at 5).

Martin sailed the Ponciana to Houston, Texas on March 11, 2011, where it conducted the gas-free operation. (Instrument No. 1 at 5). Subsequently, Martin sailed the Ponciana back to Tampa and on March 25, 2011, the USCG inspected the barge. (Instrument No. 1 at 5). On April 21, 2011, Martin formally appealed the USCG's decisions regarding its gas-free operation to the Captain of the Port for the USCG Sector St. Petersburg. (Instrument Nos. 1 at 5; 37-39 at 1). Martin alleges that on May 6, 2011, the Captain of the Port denied its appeal without an explanation. (Instrument No. 1 at 5). Martin appealed the Captain of the Port's decision to the Commander of the Seventh Coast Guard District, and that appeal was denied as moot on October 12, 2011. (Instrument No. 37-41 at 1).

## C.

On November 29, 2012, Martin filed suit against Defendants in the United States District Court for the Southern District of Texas pursuant to the Court's jurisdiction under 46 U.S.C. § 30906 and 28 U.S.C. § 1346. In its complaint, Martin alleges that Defendants imposed undue regulatory requirements on its barge the Ponciana causing Martin to suffer damages in violation of the SAA and the FTCA. (Instrument No. 1 at 1, 6). On February 11, 2013, Defendants filed a joint answer to Martin's complaint. (Instrument No. 9).

On February 18, 2014, Defendants filed this joint motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) and Rule 12(h)(3) of the Federal Rules of Civil Procedure. (Instrument No. 25 at 1). Specifically, Defendants argue that Martin cannot show a private party analogue that creates a tort duty under state law, as required by the sovereign immunity waiver provisions of the FTCA and SAA. (Instrument No. 25-1 at 15-16, 22-23). Further, Defendants argue that Martin's claims are barred by the discretionary function exception of the FTCA and SAA because the USCG used statutorily proscribed discretion in deciding whether to apply its regulations to Martin's operation. (Instrument No. 25-1 at 23). On March 31, 2014, Martin filed a response to Defendants' motion to dismiss arguing that there are private party analogues and that the discretionary function exception does not apply to its claims. (Instrument No. 37). On April 7, 2014, Defendants filed a joint reply in support of their motion to dismiss. (Instrument No. 42).

On April 11, 2014, Martin filed a motion for leave to file a sur-reply (Instrument No. 44) which the Court granted on April 22, 2014. (Instrument No. 47). On April 28, 2014, Martin filed a sur-reply. (Instrument No. 51). On the same day, Martin filed a supplemental response to Defen-

dants' motion to dismiss. (Instrument No. 50).[2]

## II.

██ " 'A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case.' " *Home Builders Ass'n of Miss. Inc. v. City of Madison,* 143 F.3d 1006, 1010 (5th Cir. 1998) (quoting *Nowak v. Ironworkers Local 6 Pension Fund,* 81 F.3d 1182, 1187 (2d Cir.1996)). A district court may dismiss an action for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure on any one of three separate bases: (1) the complaint alone, (2) the complaint supplemented by undisputed facts evidenced in the record, or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts. *Ramming v. U.S.,* 281 F.3d 158, 161 (5th Cir.2001) (citing *Barrera–Montenegro v. United States,* 74 F.3d 657, 659 (5th Cir.1996)). In examining a Rule 12(b)(1) motion, the Court is empowered to consider matters of fact which are in dispute. *See Williamson v. Tucker,* 645 F.2d 404, 413 (5th Cir.1981). Any uncontroverted facts in the complaint must, however, be accepted as true. *See Gaubert v. United States,* 885 F.2d 1284, 1285 (5th Cir.1989), *rev'd on other grounds,* 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991) (citing *Gibbs v. Buck,* 307 U.S. 66, 59 S.Ct. 725, 83 L.Ed. 1111 (1939)). Moreover, the Court must construe the complaint broadly and liberally. *See Gaubert,* 885 F.2d at 1285 (citing *Nor-*

*ton v. Larney,* 266 U.S. 511, 45 S.Ct. 145, 69 L.Ed. 413 (1925)). The burden of establishing subject matter jurisdiction rests with the party "seeking to assert federal jurisdiction." *New Orleans & Gulf Coast Ry. Co. v. Barrois,* 533 F.3d 321, 327 (5th Cir.2008). "[T]here is a presumption against subject matter jurisdiction that must be rebutted by the party bringing an action to federal court." *Coury v. Prot,* 85 F.3d 244, 248 (5th Cir.1996).

██ "A motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) is characterized as either a 'facial' attack, i.e., the allegations in the complaint are insufficient to invoke federal jurisdiction, or as a 'factual' attack, i.e., the facts in the complaint supporting subject matter jurisdiction are questioned." *Bank v. Spark Energy Holdings LLC,* 2013 WL 5724507 *3 (S.D.Tex. Oct. 18, 2013) (citing *In re Blue Water Endeavors, LLC,* 2011 WL 52525 *3 (Bankr.E.D.Tex. Jan.6, 2011)). A facial attack occurs when a defendant asserts a 12(b)(1) motion to dismiss without attaching evidence. *Paterson v. Weinberger,* 644 F.2d 521, 523 (5th Cir.1981). In that instance, the Court must take the allegations in the complaint as true. *Saraw P'ship v. United States,* 67 F.3d 567, 569 (5th Cir.1995). A factual attack occurs when the defendant attaches evidence relevant to the issue of jurisdiction to its motion to dismiss. *Spark Energy Holdings LLC,* 2013 WL 5724507 at *3. In that instance, "no presumption of truthfulness attaches to the plaintiffs allegations, and the court is free to decide the merits of the jurisdictional dispute." *Id.*

---

2. On January 7, 2014, Martin filed a letter with the Court seeking resolution of a discovery dispute during which Defendants withheld internal USCG communications pursuant to the deliberative process privilege. (Instrument No. 21). In its original response to Defendants' motion to dismiss, Martin states that the documents Defendants

withheld would provide jurisdictional facts necessary to overcome Defendants' motion to dismiss. (Instrument No. 37 at 1). The discovery dispute has since been resolved and the Court offered Martin the opportunity to amend its response. *See* (Instrument No. 46).

(citing *Williamson,* 645 F.2d at 413). "The [c]ourt's consideration of such matters outside the pleadings does not convert the motion to one for summary judgment." *Id.; Williamson,* 645 F.2d at 412.

■ A motion to dismiss pursuant to Rule 12(b)(1) should be granted only if it appears that the plaintiff cannot prove any set of facts in support of his claim that would entitle him to relief. *Ramming,* 281 F.3d 158, 161 (5th Cir.2001) (citing *Home Builders Ass'n of Miss., Inc.,* 143 F.3d at 1010).

### III.

■ The Court first addresses whether the discretionary function exception bars Martin's claims under the FTCA and SAA. The United States is immune from suit unless it waives sovereign immunity and consents to be sued. *F.D.I.C. v. Meyer,* 510 U.S. 471, 475, 114 S.Ct. 996, 1000, 127 L.Ed.2d 308 (1994). Absent an express waiver by Congress, federal courts do not have subject matter jurisdiction to hear suits against the United States. *Id.* "The FTCA waives sovereign immunity and permits suit against the United States for claims sounding in state tort law for money damages.... It provides district courts with jurisdiction over monetary claims against the Government for the negligent or wrongful acts of its employees 'where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.'" *Spotts v. United States,* 613 F.3d 559, 566 (5th Cir. 2010) (citing 28 U.S.C. §§ 1346(b)(1)). The SAA waives sovereign immunity and permits suit against the United States where "a civil action in admiralty could be maintained" against a private person. 46 U.S.C. § 30903; *Theriot v. United States,* 245 F.3d 388, 397 (5th Cir.1998).

■ However, even if a plaintiff shows that a private party analogue exists, a suit pursuant to the FTCA or SAA may still be barred by the discretionary function exception. *Spotts,* 613 F.3d at 566 (citing *United States v. Gaubert,* 499 U.S. 315, 328–32, 111 S.Ct. 1267, 1277–78, 113 L.Ed.2d 335 (1991)). "The discretionary function exception withdraws the FTCA's waiver of sovereign immunity in situations in which, although the government employee's actions may have been actionable under state tort law, those actions were required by, or within the discretion committed to, that employee under federal statute, regulation or policy." *Id.* (citing 28 U.S.C. § 2680(a)). The Fifth Circuit has held that the SAA has an implied discretionary function exception identical to the exception set forth in the FTCA. *MS Tabea Schiffahrtsgesellschaft MBH & Co. KG v. Bd. of Com'rs of Port of New Orleans,* 636 F.3d 161, 165 n. 1 (5th Cir. 2011). "Once the Government asserts the discretionary function exception, the party bringing suit must establish that it does not apply in order to establish jurisdiction." *Osprey Ship Mgmt. Inc. v. Foster,* 387 Fed.Appx. 425, 430 (5th Cir.2010) (noting that plaintiffs bear the burden of showing that the discretionary function exception does not apply in suits pursuant to the SAA); *Spotts,* 613 F.3d at 568 (noting that plaintiffs bear the burden of showing that the discretionary function exception does not apply in suits pursuant to the FTCA).

■ The Supreme Court has established a two-prong test to determine whether the discretionary function exception applies. *Gaubert,* 499 U.S. at 328–32, 111 S.Ct. at 1276–78. First, the Court must determine whether the challenged actions were discretionary. *Id.* at 328, 111 S.Ct. at 1276. "If a statute, regulation or policy leaves it to a federal agency to determine when and how to take action,

the agency is not bound to act in a particular manner and the exercise of its authority is discretionary." *Spotts,* 613 F.3d at 567 (citing *Gaubert,* 499 U.S. at 329, 111 S.Ct. at 1277). "When an agency determines the extent to which it will supervise the safety procedures of private individuals, it is exercising discretionary regulatory authority of the most basic kind." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 819–20, 104 S.Ct. 2755, 2767, 81 L.Ed.2d 660 (1984); *see also Galvin v. Occupational Safety & Health Admin.,* 860 F.2d 181, 184 (5th Cir.1988) ("Other courts have recognized the broad discretionary authority inherent in OSHA's regulatory scheme, and have therefore held that FTCA claims arising from OSHA's alleged negligent inspection or failure to inspect came within the discretionary function exception."); *Padilla v. United States,* 2007 WL 2409792 *11 (W.D.Tex. Aug.20, 2007) (holding that criminal enforcement decisions such as whether to investigate or prosecute are discretionary in nature); *Sloan v. U.S. Dept. of Hous. & Urban Dev.,* 236 F.3d 756, 760–61 (D.C.Cir.2001) (holding that the government's decision to initiate administrative proceedings based on the application of government mandated auditing standards was discretionary).

Second, if the act involves discretion, the Court must determine whether the decision was "susceptible" to the analysis of social, economic, and political policy. *Gaubert,* 499 U.S. at 332, 111 S.Ct. at 1278; *see also Spotts,* 613 F.3d at 572 (noting that a decision must be susceptible to policy analysis but does not have to be the "end product" of policy analysis); *Berkovitz by Berkovitz v. United States,* 486 U.S. 531, 537, 108 S.Ct. 1954, 1959, 100 L.Ed.2d 531 (1988). The second prong requires that the Court determine whether the Government could have weighed policy considerations in reaching its decision. *Walding v. United States,* 955 F.Supp.2d 759, 790 (W.D.Tex.2013) (finding that in "choosing among the many possible measures to respond to possible risks" the government's decision was susceptible to policy analysis). The discretionary function exception shields such decisions from "judicial 'second-guessing.'" *Spotts,* 613 F.3d at 568 (quoting *Gaubert,* 499 U.S. at 322–23, 111 S.Ct. at 1273). The Supreme Court has held that "decisions as to the manner of enforcing regulations" are always susceptible to policy analysis finding that such decisions require an agency to consider policy objectives, and practical considerations such as staffing and funding. *Varig Airlines,* 467 U.S. at 820, 104 S.Ct. 2755. Where a law gives government employees discretion, "the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations." *Gaubert,* 499 U.S. at 324, 111 S.Ct. at 1274.

### A.

### 1.

### a.

Here, Defendants contend that the discretionary function exception applies to Martin's claims because the USCG issued the COTPO at issue pursuant to the discretion afforded the USCG by §§ 1223(b)(3) and 1225 of the Ports and Waterways Safety Act ("PWSA") and regulations promulgated under the PWSA. (Instrument No. 25–1 at 27).

Martin contends that Defendants have not satisfied the first prong of the discretionary function exception because the USCG acted without the authority of any statute, regulation, or policy. (Instrument No. 37 at 47). Specifically, Martin

argues that because the USCG rescinded all of its bases for prohibiting the operation, it did not have a basis from which it could assert discretion. (Instrument No. 37 at 47). Further, Martin argues that the USCG never articulated a safety concern, and so did not act pursuant to its discretion under the PWSA in prohibiting Martin's gas-free operation. (Instrument No. 50 at 7–8). Specifically, Martin cites to an e-mail between the Captains of the Port in Tampa and Houston in which Captain Sheryl Dickinson ("Dickinson") of Tampa gives Captain Marcus Woodring ("Woodring") of Houston advance notice of the Ponciana's proposed gas-free operation. (Instrument No. 50–3 at 2). Martin contends that because Dickinson did not mention any safety concerns about the operation, the email shows that the USCG's argument that it acted in the interest of safety pursuant to the PWSA is a pretext. (Instrument No. 50 at 5).[3] Further, Martin cites to a letter from W.D. Baumgartner, Rear Admiral U.S. Coast Guard Commander, Seventh Coast Guard District ("Baumgartner") in which Baumgartner states, "I agree that certification of the flare system is not required and is not necessarily the most salient safety factor for the flaring operation." (Instrument No. 37–41 at 1).

Martin's argument that the USCG did not act pursuant to the PWSA is unavailing. The USCG issued the COTPO at issue "under the authority of the Ports and Waterways Safety Act, 33 U.S.C. § 1221" and stated that Martin's gas-free operation "does not comply with the requirements of 33 C.F.R. § 127, and as such poses a hazard to the vessel, the facility, the port and the surrounding waterway." (Instrument No. 25–2 at 14). The fact that the USCG rescinded its COTPO and issued its decision pursuant to 33 C.F.R. pt. 154 does not mean the USCG was not acting pursuant to the PWSA at the time it issued the COTPO. Even after the COTPO was rescinded on March 11, 2011, the USCG consistently stated that it was acting pursuant to the PWSA and regulations enacted thereunder when it prohibited Martin's gas-free operation. *See* (Instrument Nos. 37–40 at 1; 37–41 at 1). Further, the letter from Baumgartner goes on to say that while the gas-free operation will not be treated as "per se unsafe," the USCG will request and review a written operations plan to "assess potential impacts to the safety of the waterfront facility, the waterway, and the port," pursuant to its authority under the PWSA. (Instrument No. 37–41 at 1–2). Accordingly, the Court finds that the USCG acted pursuant to the PWSA.

**b.**

The Court must also determine whether the USCG's actions meet the requirements of the discretionary function exception. Martin also contends that the USCG's actions did not involve an element of discretion because the USCG did not act pursuant to any regulatory authority. (Instrument No. 37 at 47).

 Section 1223(b)(3) of the PWSA states that the Secretary, or in this case

---

**3.** Defendants contend that Martin cites to inadvertently produced documents in its response to Defendants' motion to dismiss however, they did not file a motion seeking to recover those documents. (Instrument No. 42 at 3). Defendants assert that the documents are subject to the deliberative process privilege. (Instrument No. 30). On April 17, 2014, the Court issued an order ruling that the documents, identified as Bates Number U.S. 000012–US 000013, are partially privileged. *See* (Instrument No. 46 at 1–2). The parts of the documents Martin cites to contain information similar to other documents that have already been deemed discoverable. The Court will not, however, rely on any of the privileged information in its analysis.

his designees, *may* issue an order if "by reason of weather, visibility, sea conditions, port congestion, other hazardous circumstances, or the condition of such vessel, he is satisfied that such directive is justified in the interest of safety." 33 U.S.C. § 1223(b)(3) (emphasis added). To issue an order under § 1223(b)(3), the Secretary must use his judgment to determine whether unsafe circumstances exist. *See* 33 U.S.C. § 1223(b)(3). Further, § 1223(b)(3) states that the Secretary may order the vessel to "operate or anchor in a manner he directs." 33 U.S.C. § 1223(b). This language indicates that the USCG had the authority to decide whether Martin's operation put the waterway in danger and if so, the manner in which the USCG would regulate the matter. *See* 33 U.S.C. § 1223(b); *Spotts*, 613 F.3d at 567 (citing *Gaubert*, 499 U.S. at 329, 111 S.Ct. at 1277). Further, the USCG's regulations promulgated under the PWSA show that the USCG retained discretion. Under 33 C.F.R. § 160.111, the District Commander or Captain of the Port may issue an order when they have "determined that such an order is justified in the interest of safety by reason of weather, visibility, sea conditions, temporary port congestion, other temporary hazardous circumstances, or the condition of the vessel." 33 C.F.R. § 160.111(c). Additionally, 33 C.F.R. § 160.109 states that the District Commander or the Captain of the Port may direct the movement of "hazardous material" to prevent harm to the waterways, or adjacent shores and land structures. 33 C.F.R. § 160.109. Under, 33 C.F.R. § 127.013 the Captain of the Port may issue an order "to suspend [Liquefied Hazardous Gas] or [Liquefied Natural Gas] transfer operations if the Captain of the Port finds any condition requiring immediate action to (1) Prevent damage to ... any bridge or other structure on or in the navigable waters ... and (2) Protect the navigable waters and the resources therein from harm...." 33 C.F.R. § 127.013. This language indicates that the USCG retained discretion to determine whether to issue an order in the interest of safety.

 Further, Martin argues that the USCG did not have discretion to decide whether to inspect its barge because 46 U.S.C. § 3308 proscribes a course of action for the USCG to follow regarding ship inspections. (Instrument No. 37 at 52). Consequently, Martin argues that the USCG's decision not to inspect its barge is not subject to the discretionary function exception. (Instrument No. 37 at 52). Defendants contend that the USCG never refused to inspect Martin's barge. (Instrument No. 42 at 10). In fact, Martin concedes that the USCG inspected the Ponciana on March 25, 2011, and the only disputed issue regarding the inspection is the timing of the inspection. (Instrument No. 1 at 5). 46 U.S.C. § 3308(1) states that the Secretary shall examine "each vessel subject to inspection at proper times to ensure compliance with law and regulations." 46 U.S.C. § 3308(1). The statute does not mandate a specific time for the inspection, stating only that that the time should be proper. 46 U.S.C. § 3308(1). Therefore, the timing determination is left to the Secretary's discretion. *See* 46 U.S.C. § 3308(1); *Spotts*, 613 F.3d at 567 (citing *Gaubert*, 499 U.S. at 329, 111 S.Ct. 1267).

 Martin further contends that even if the USCG's actions were discretionary, the exception does not apply because the USCG negligently and arbitrarily applied its regulations. (Instrument No. 37 at 49–50). Martin cites to an e-mail between Dickinson and Commander Sean Reilly ("Reilly"). In the e-mail dated after the COTPO was issued, Dickinson asks Reilly "[i]s a certifying entity readily available or

is this a big lift for them?" (Instrument No. 50–3 at 2). Martin argues that this shows that the USCG issued its COTPO without considering the feasibility of compliance. (Instrument Nos. 50 at 4–5; 50–3 at 2). Further, Martin argues that the exception does not apply because the USCG's actions were taken at the operational level rather than the policymaking level. (Instrument No. 37 at 51). Martin misrepresents the scope of the exception. In *Gaubert*, the Supreme Court stated that "[a]ctions taken in furtherance of the program were likewise protected, even if those particular actions were negligent." *Gaubert*, 499 U.S. at 323, 111 S.Ct. at 1274 (citing *Varig Airlines*, 467 U.S. at 820, 104 S.Ct. 2755). Further, discretionary conduct is covered by the exception whether it is completed at the operational or policymaking level. *Id.* at 325, 111 S.Ct. at 1275. The Court finds that the first prong of the discretionary function exception is satisfied.

**2.**

■ Defendants argue that the USCG met the second prong of the discretionary function exception because it carefully weighed safety concerns in deciding how to regulate Martin's proposed gas-free operation, which was a policy goal Congress contemplated when enacting the PWSA. (Instrument No. 25–1 at 28–29).

In *Varig Airlines,* an airline brought an FTCA claim against the United States alleging that the Federal Aviation Administration ("FAA") was negligent in failing to detect safety violations during an inspection. *Varig Airlines*, 467 U.S. at 800–01, 104 S.Ct. 2755. The FAA implemented its compliance program pursuant to the Federal Aviation Act in which Congress directed the Secretary of Transportation to promote safety in the aviation industry and delegated discretion to the Secretary to implement a regulatory program. *Varig Airlines*, 467 U.S. at 804, 104 S.Ct. 2755. The Supreme Court unanimously held that the FAA's decision to implement a regulatory compliance regime and its subsequent failure to detect safety violations under that system were both protected by the discretionary · function exception. *Varig Airlines*, 467 U.S. at 820, 104 S.Ct. 2755. In so holding, the Court noted that "decisions as to the manner of enforcing regulations" are susceptible to policy analysis finding that such decisions require an agency to consider policy objectives, and practical considerations such as staffing and funding. *Id.* The Court concluded that "[j]udicial intervention in such decisionmaking through private tort suits would require the courts to 'second-guess' the political, social, and economic judgments of an agency exercising its regulatory function." *Id.*

The regulatory program at issue here is very similar to the regulatory program at issue in *Varig Airlines.* As in *Varig Airlines,* Congress tasked the USCG with upholding safety and gave the USCG discretion to decide the manner in which it would do so. *See* 33 U.S.C. § 1223(b); *Varig Airlines*, 467 U.S. at 804, 819–20, 104 S.Ct. 2755. Faced with a potential safety risk, the USCG contends that it considered several regulations in reaching its decision to prohibit Martin's gas-free operation. (Instrument Nos. 25–1 at 29; 25–2 at 11). The USCG initially applied 33 C.F.R. pt. 127, but upon consideration of additional information, concluded that Martin's proposed operation did not involve a transfer of hazardous substances. (Instrument No. 25–2 at 11). The USCG then concluded that 33 C.F.R. pt. 160 required Martin to certify the flaring system it intended to use during the gas-free operation. (Instrument No. 25–2 at 11, 17). Martin characterizes this as evidence of the arbitrariness of the USCG's decisions. (In-

 

strument No. 50 at 4–5). However, courts have found that weighing options in response to safety risks is a part of the policy analysis protected by the discretionary function exception. *See Walding,* 955 F.Supp.2d at 790; *see also Spotts,* 613 F.3d at 572.

Further, Martin contends that the inspection was delayed because the USCG prohibited the gas-free operation. (Instrument No. 1 at 6). Because the delay was caused by the USCG's response to a safety risk, the Court finds that the decision to delay the inspection was susceptible to the same policy analysis the USCG undertook in deciding to prohibit the gas-free operation. 46 U.S.C. § 3308(1); *Varig Airlines,* 467 U.S. at 804, 819–20, 104 S.Ct. 2755.

The Court finds that the discretionary function exception under the FTCA and SAA withdraws any waiver of sovereign immunity. Consequently, there is no waiver of sovereign immunity in this case and this Court does not have subject matter jurisdiction. Ordinarily, the Court would consider whether Martin has met the private party analogue requirement before determining the applicability of the discretionary function exception. Because the Court finds that the discretionary function exception applies, the Court need not address whether Martin has met the private party analogue requirement. *See Spotts v. United States,* 2009 WL 3150872 (E.D.Tex. Sept. 26, 2009) *aff'd,* 613 F.3d 559 (5th Cir.2010) (analyzing the applicability of the discretionary function exception without analyzing whether private party analogues existed under Texas common law).

Accordingly, the Court GRANTS Defendants' motion to dismiss Martin's FTCA and SAA claims.

### IV.

Based on the foregoing, IT IS HEREBY ORDERED THAT Defendant's Motion to Dismiss is **GRANTED.** (Instrument No. 25).